JAMES *v.* PATTEN *et al.*

*Statute of Frauds.*

Under the revised statutes, the note or memorandum in writing, of a sale of goods, must be signed, at the end thereof, by the party to be charged, in order to render the contract obligatory on him.[1]

James *v.* Patten, 8 Barb. 344, overruled.

APPEAL from the general term of the Supreme Court, in the third district, where a judgment entered for the plaintiff, in a case tried by the court, without a jury, had been affirmed, and a motion for a new trial denied. (Reported below, on a former trial, 8 Barb. 334.)

This was an action of *assumpsit* to recover damages for the non-delivery of a quantity of corn, sold by M. & S. Patten, the defendants, to the plaintiff, for the Irish relief committee, on the 12th March 1847, for which a bill of sale, admitted to be in the handwriting of S. Patten, one of the defendants, was given, in the following words:

[1] The statute of frauds requires an actual manual subscription, at the end of the agreemen: or memorandum, by the party to be charged therewith. Vielie *v.* Osgood, **8** Barb. 130.

*"Albany, March 12th 1847.

Mr. Thomas James bought of M. & S. Patten (for the Relief Committee), 3000 bushels yellow corn (fifty-six pounds for bushel), to be delivered at the opening of the Hudson River navigation, at our store in Albany, at eighty-one cents per bushel,       $2430."

After the opening of the navigation, the plaintiff tendered the price, and demanded the corn, which was refused—the price having risen to ninety-seven cents per bushel. At the close of the plaintiff's testimony, the defendants moved for a nonsuit, on the ground that the contract was not subscribed by them; and also that the contract was, in fact, made with the relief committee and not with the plaintiff. The learned judge overruled the motion; and the defendants excepted. They then offered to prove that the Irish relief committee had purchased a large quantity of corn, through the plaintiff, as their agent; and that, at the opening of· the navigation, they had offered to. deliver to that committee the 3000 bushels of corn. This offer was overruled, and another exception taken.

The judge directed a judgment in favor of the plaintiff, for $541,45, which having been affirmed at general term, the defendants took this appeal.

*Jenkins*, for the appellants.

*Hammond*, for the respondent.

PAIGE, J.—The principal question to be decided in this case is, whether the memorandum of the contract entered into between the parties, was a valid note or memorandum of such contract, within the statute of frauds. The objection made to it is, that it was not subscribed by the defendants, the parties to be

*charged thereby. The section of the chapter of frauds contained in the revised statutes relative to contracts for the sale of goods and chattels, declares, that every contract for the sale of goods, &c., for the price of fifty dollars, or more, shall be void; unless—1. A note or memorandum of such contract be made in writing, and be *subscribed* by the parties to be charged thereby; or, 2. Unless the buyer shall accept and receive part of such goods, &c.; or, 3. Unless the buyer shall, at the time, pay some part of the purchase-money. (2 R. S. 136, § 3.) The old statute of frauds, passed February 26th, 1787, as well as the British statute of 29 Charles II., c. 3, were substantially in the same words, with the exception of the word "subscribed." (1 Rev. L. of 1813, p. 79, § 15; 1 Chit. on Cont. 385.) Those statutes required the note or memorandum of the contract to be *signed* by the parties, instead of being *subscribed* by them.

Under the judicial construction of our old statute, and of the British statute, it was not necessary to the validity of the contract, or of the note or memorandum thereof, that it should be signed underneath, or at the end. It was held to be a compliance with the statute, if the name of the party to be charged appeared in any part of the instrument, either at the top, in the middle, or at the bottom, provided it was placed there by the party himself, or by his authority, and was applicable to the whole substance of the writing. (*Clason* v. *Bailey,* 14 Johns. 486; 12 Id. 106–7.) Thus the law stood at the time of the revision. The revisers, in their notes to the 8th section of the 1st title of the chapter of frauds, as reported by them, say, it had been held, under the former statute of frauds, "that the literal act of signing is not necessary, although the statute speaks of 'signing.' After setting out with this principle, the courts found themselves perfectly at large as to what should be considered a signing. To prevent difficulties of this sort hereafter, the revisers propose to require that these

agreements shall be subscribed." The revisers, at the end of the 3d section of the 2d title, which relates to contrácts for the sale of goods, and in which they also substituted the word "subscribed," for the word "signed," * 12 ] refer to *their notes to the preceding sections. The note to the 8th section of the 1st title, is a plain expression of their understanding of the meaning of the word "subscribed;" and a clear manifestation of their intention in recommending its substitution for the word "signed." It is perfectly clear, from the note of the revisers, that they intended by the word "*subscribed,*" to require the manual signing of the agreement, at the end thereof, by the party to be charged. When the members of the legislature passed upon the sections of the chapter of frauds, as reported by the revisers, they had their notes before them, defining the meaning of the word subscribed, and, in substance, declaring that the adoption of that word would require an actual manual subscription, at the end of the note or memorandum of the contract. The legislature, under these circumstances, retaining the word "subscribed," as proposed by the revisers, must be understood to have done so, for the purpose of requiring an actual signing, in writing, of the agreement or memorandum thereof, underneath the same.

We cannot now so construe these sections of the chapter of frauds, as to dispense with the necessity of an actual subscription, without disregarding the plainly-declared will of the legislature. It is the office of the courts, to administer the law as the legislature has declared it; not to alter the law by means of construction, in order to remedy an evil or inconvenience resulting from a fair interpretation of the law. The etymology and definition of the word *subscribe,* as given by lexicographers, show that its meaning, when applied to the signature to an instrument in writing, as understood by men of letters, is the signature or writing of one's name beneath, or at the end of the instrument; this is

also its popular signification. I am aware, that the popular meaning of the word "signed," when applied to a contract or other instrument, is, generally, writing one's name at the bottom; and that this is sometimes its literary meaning; but this is not so emphatically and universally its meaning, as it is the meaning of the word "subscribed." The derivation of that word from the Latin word *subscribo*, shows that, literally, and according to its derivation, its meaning is, "to *write under," or "underneath." But this is not the [ * 13 primary or derivative meaning of the verb "to sign;" such meaning is, to write one's name on paper, or to show or declare assent or attestation, by some sign or mark.

I concede, we are not always, in the construction of a statute, to be controlled by the literary signification of words, or their primary or derivative sense; and that where they have not, by long habitual construction, received a peculiar or technical meaning, they are to receive their natural and ordinary signification. (*Wain* v. *Warlters*, 5 East 10.)

In all cases, the intention of the law-maker in using the words is to be sought after, and when that is ascertained, it must be followed, with reason and discretion, in the construction of the statute. Wherever any words are obscure or doubtful, the intention of the legislature must be resorted to, in order to find their meaning. (Bac. Abr. Stat. I. 5.) In the revision of the statute of frauds, no motive can be assigned, for rejecting a word, the legal meaning of which had been established by a long line of adjudications, and substituting another, which had never received a judicial interpretation, but which had a known limited meaning; unless it was to change the law, or the construction of the statute, so as to require an actual signing of the name of the party, at the end of the contract, or of the memorandum thereof. Although, in common parlance, the word "signed," in

13

reference to a contract or other instrument in writing, is generally understood as a writing of the name at the bottom; yet, now, neither in its ordinary or legal use, is it confined to that office; but the word "subscribed," in its habitual use, and according to both its popular and literary signification, is limited to a signature at the end of a printed or written instrument. It has a secondary meaning, but that is· purely metaphorical, denoting assent, without reference to any mode of expressing it by actual writing.

It seems to me, therefore, that the legislature, by the substitution of the word "subscribed," for the word "signed," intended a change in substance of the statute of frauds, and to attain a greater degree of certainty in contracts, by requiring *an authentication, by an actual subscription of the contract, or of the memorandum thereof, by the party to be charged, or his lawful agent. This alteration is more than a verbal one, or a mere change of phraseology; it is an alteration in substance; the rejection of a word, which by means of judicial interpretation, had an extensive legal signification; and the adoption of another in its place, which had, in its popular and literary use, and according to the general popular understanding, a known limited meaning. According to the familiar rules of construction, this substituted word must receive its natural and ordinary signification. (5 East 10; Bac. Abr. Stat. I. 2.) And if that is accorded to it, the contract or memorandum must now be authenticated by a manual signature at the end. In neither a popular, literary nor legal sense, are the words "signed" and "subscribed" synonymous, or of equivalent meaning. In the case of *Merritt* v. *Clason* (12 Johns. 102), it was conceded by the eminent counsel who argued that case, that there was a plain distinction between signing and subscribing. Mr. Wells says, "signing does not, *ex vi termini*, mean that the name of the party should be subscribed." Mr. D. B.

Ogden replies, "I do not say, that the agreement must be subscribed, but that it must be signed in some part of the contract."

I do not think, that all the foregoing arguments can be overthrown, by the mere circumstance that the legislature, in the chapter in relation to wills, from abundant and unnecessary caution, added to the provision requiring the will to be subscribed by the testator, the words, "at the end of the will." The chapter in relation to wills was acted upon previously to the enactment of the chapter in relation to fraudulent conveyances and contracts. When the latter chapter was examined and passed, the legislature had the notes of the revisers before them, which explained the distinction between the words *signed* and *subscribed;* and, I think, we must presume, that the word "*subscribed*" was adopted, in reference to its meaning as defined by the revisers.

This question was expressly determined by the court of errors, in *Davis* v. *Shields* (26 Wend. 341), and is, therefore, no longer *open for debate. In that case, it was elaborately and learnedly discussed [ * 15 by the late chancellor, and by Senator VERPLANCK, and both of them came to the conclusion that the word "subscribed," as used in the statute of frauds, requires an actual signing in writing of the name of the party who is to make a sale of an interest in lands, or to be charged by a contract for the sale of goods, at the end of the contract or of the memorandum thereof. The ground on which the binding force of this decision is sought to be evaded or overthrown is, in my judgment, unsound. The argument is, that inasmuch as Chancellor WALWORTH and Senator VERPLANCK examined two questions in that cause: 1. Whether, as the memorandum of the broker varied from the contract made by the parties, there was a contract binding on either party: and 2. Whether the word "subscribed" required an

15

JAMES *v.* PATTEN.      [Dec.

actual signing of the name of the party to be charged, at the end of the contract or memorandum; and as all the other members of the court, with one exception, voted silently with them to reverse the judgment of the supreme court, that it is impossible to discover on which of the two questions a majority of the court voted for such reversal; although Chancellor WALWORTH and Senator VERPLANCK agreed, that both of the questions were erroneously decided by the supreme court.

If this argument is to prevail, it will unsettle a great portion of our law, which, by universal consent, has been regarded as definitely established. If, in a case like that of *Davis* v. *Shields*, it is held, that no point of law was decided, then no case is authority for any purpose, which is decided by a court consisting of more than one judge, where one member of the court only delivers a written opinion, disposing of several questions distinctly arising in the cause, the decision of each of which is fatal to the recovery or defence, and the other members of the court concur, without respectively declaring their individual views in regard to any of the questions discussed in such opinion. Such a doctrine is opposed to the general understanding of the bar, and to the uniform practice of the courts, in recognising such cases as binding authority as to all the questions *which legitimately arose in the cause, and were passed upon by the judge who delivered the written opinion. Where a court consists of several judges, two or more of whom deliver opinions, and all arrive at the same general result in the cause, but for different reasons, and the residue of the judges give a silent vote of concurrence with them, in a decision for the one party or the other; there, as it does not appear that a majority of the court agreed as to any one question in particular, as the ground of the decision, the case cannot be considered as authority on any of the

questions which arose in the cause.[2]  But where several questions arise in the cause, and the opinions delivered agree in regard to all of them, and the other members of the court give a silent vote of concurrence, there, all the questions will be deemed to have been determined by a majority of the court, and the case will be regarded and respected as an authoritative adjudication of all such questions.

It has been held by several of the courts of this state, that the case of *Davis* v. *Shields* (26 Wend. 341), expressly determined that the word "subscribed," in the chapter of the revised statutes in relation to the fraudulent conveyances and contracts, called for an actual subscription of the name of the party at the end of the contract. Chancellor WALWORTH so held in *Cole* v. *Bowne* (10 Paige 537), and in *Champlin* v. *Parish* (11 Id. 410–11), and a like decision was made by the supreme court for the fourth district, in *Vielie* v. *Osgood* (8 Barb. 134).  As a member of the senate, I took a part in the decision of the case of *Davis* v. *Shields;* and at the time that cause was decided, I had no doubt, nor have I any now, that a majority of the court, in voting for a reversal of the judgment of the supreme court, concurred with Chancellor WALWORTH and Senator VERPLANK as to both of the questions discussed in their opinions.  I dissented from the opinion of the majority of the court, on the ground that the legislature, by substituting the word "subscribed," for the word "signed," used in the former statute of frauds, did not intend to change *the law.  From my present examination of this [ * 17 question, I am satisfied, that I was mistaken in the opinion I then expressed.

---

[2] See Thomas *v.* Jenks, 5 Rawle 225, where Chief Justice GIBSON, speaking of the case of Burd *v.* Smith, 4 Dall. 76, says, that the reasons of the judges were so indistinctly set forth in that case, and the discrepance of their views was so remarkable, as to render it of little value for anything.

I am of opinion, that the judgment of the supreme court should be reversed, and a new trial granted.

GARDINER, J.—The contract in question was not subscribed, within the meaning of the 3d section of the statute of frauds. The word "sign," primarily means any written authentication of a contract, by the person to be charged; hence, the inserting the name of the testator, in the middle, or at the commencement of the will, was held a sufficient signature. Judge COWEN remarks, in *Davis* v. *Shields* (24 Wend. 327), that the words signing and subscribing, when applied to a contract, or other instrument, always, in common understanding, meant the same thing, namely, writing one's name at the bottom. This is true, undoubtedly. Business men, when speaking of the signature to a note, mean an undersigning, and most men out of the legal profession would consider a contract, with the contractor's name at the commencement, instead of the close of the instrument, as unexecuted. The courts, in declaring that a signature might be in any part of the instrument, if the intention of the contractor was manifest, did not, therefore, depart from the primary signification of the word, but from the meaning in which it was generally accepted.

In the revision of the statutes, the legislature intended to substitute the popular meaning, for one adopted by judicial construction. They did this, by a change of phraseology, in substituting "subscribed," which indicates the making of a particular kind of signature, for "signed," which applied to every species of written authentication. The supreme court, in *Davis* v. *Shields*, in adhering to the old construction, violated both the primary and popular meaning of the word "subscribe," and the clear intention of the legislature.

The revisers state, "that the courts, setting out with the principle, that a *literal* signing was not necessary,

found themselves perfectly at large, as to what should be considered *a signing; to prevent difficulties of this sort hereafter, the revisers propose that these [ * 18 agreements shall be '*subscribed.*'" (3 R. S. 655, in connection with 656.) With this explanation before them, the legislature adopted the change of phraseology, and it is fairly to be presumed, for the reason suggested by the revisers.

Notwithstanding this plain intimation of the legislature, the supreme court, in *Davis* v. *Shields* (24 Wend. 328), came to the conclusion, "that there was no greater judicial effort in enlarging the term subscribed, into a secondary sense," than had been made by their predecessors, upon the word "sign;" they, therefore, held, that the law was not changed by the revision. Their judgment was reviewed and reversed in 26 Wend. 347, by the court for the correction of errors. Opinions were delivered by the Chancellor and Senator VERPLANCK, in favor of reversal, upon this precise point, which was the prominent one in both courts. Senator PAIGE was for affirmance, and in his opinion, discussed no other question. Every other member of the court voted in accordance with the views expressed by the Chancellor and Senator VERPLANCK.

We are now gravely informed, that it was possible to reverse the judgment upon other grounds. The effect of any decision in a court composed of more than a single judge, might, in this way, be avoided. But when two questions are presented to the appellate court, upon which their decision is asked, both of which are discussed by counsel, and each is considered and determined in the only opinions read in the hearing of the members, the majority must be deemed to acquiesce in the conclusions upon those questions reached in those opinions, unless some one dissents. With a different rule, there could be no such thing as the establishment of a principle by the court of last resort, where more

19

than a single point was presented; the decision would not settle anything except as between the parties. The subordinate court might speculate, as they have in this case, upon the possibility that the decision might have been upon a single ground, although it professed to be upon all the *questions; and as they could not say, with infallible certainty, which was the true one, they would not receive it as authority upon either.

\* 19 ]

I do not doubt the intention of the legislature, in changing the phraseology of the statute, at the time of the revision, or as to the effect of the decision in the court of errors upon the attestation. Upon both grounds, the judgment of the court should be reversed.

Judgment reversed.