## MATTER OF NORTH V. CARY.

4 TC 357
67 AD 377

*Official books and papers — proceedings to obtain possession — Municipal corporations — Construction of charter of Cohoes.*

Under the statutes relating to "Proceedings to compel the delivery of books and papers by public officers to their successors" the title to an office where there are adverse claimants cannot be tried, but the party in possession of such books cannot retain the same upon frivolous grounds, or such as create no reasonable doubt as to the right of the applicant.

The charter of the city of Cohoes (Laws 1869, chap. 912), provides that the bond of the chamberlain "shall be approved by the mayor and common council." The charter (tit. 5, § 1) also declares that the mayor and aldermen of the city shall constitute the common council. *Held,* that the bond must be approved by the mayor independently of the common council, and that the approval by the common council does not include the approval of the mayor, although a part of such council.

The charter named also provides (tit. 5, § 6), that "whenever the mayor shall be absent from the city or from any meeting, the aldermen may appoint one of their number mayor for the time being, who shall hold office until the mayor returns, but shall vote as an alderman, and not have the casting vote or the power of veto." *Held,* that the provision refers only to the organization of meetings, and was not intended to authorize the aldermen to appoint a mayor to discharge all the duties devolved by the charter upon that officer, and an alderman chosen mayor *pro tem.* could not approve the sureties to the chamberlain's bond.

The charter also (tit. 4, § 1) provides that the mayor "shall have the power to veto any resolution or ordinance of the common council." *Held,* that he was not thereby authorized to veto the appointment of an officer the power to appoint whom was by the charter in the common council.

The charter also provides (tit. 5, § 6), that the common council shall determine the rules of its own proceedings," and (§ 5) that "the common council shall hold *stated* meetings at least once in each month." The common council, in 1872, by rule appointed stated times for meetings. *Held,* that the appointment continued in force until changed, and did not expire with the terms of office of the members who adopted it, and a meeting held in accordance therewith, in 1874, was not irregular.

APPLICATION by Charles F. North claiming to be chamberlain of the city of Cohoes, to compel Leonard Cary, his predecessor in said office, to deliver up the books and papers of said office to said North, which application was made under and by virtue of article 5, chapter 5, title 6, part 1, of the Revised Statutes, entitled "Proceedings to compel the delivery of books and papers by public

officers to their successors."    (1 R. S. 124–126.)    The necessary facts appear in the opinion.    The application was decided March, 1874.

C. F. Doyle and R. A. Parmenter, for application.

P. D. Niver and Samuel Hand, in opposition.

INGALLS, J.   When a party has been elected or appointed to an office, and his predecessor in such office refuses to deliver up the books and papers belonging to such office, an application may be made under the statute referred to, to a justice of the supreme court, who is authorized in case the party complained against refuses, without satisfactory reason, to deliver to his successor such books and papers, to direct such delivery, and to commit such party to the jail of the county, there to remain until he complies with such order or is discharged according to law.   This proceeding is summary and severe, and hence should be enforced with reasonable caution.   It is nevertheless a salutary provision in a proper case, and furnishes an adequate and expeditious remedy against a party who, through ignorance, wantonness or malice, undertakes to deprive an officer duly elected or appointed of the possession of the books and papers belonging to such office.   This statute is not adapted to, nor was it intended to try the title to an office, when there were adverse claimants.   In such case the remedy is by quo warranto.   People v. Stevens, 5 Hill, 617; People v. Allen, 42 Barb. 203; Devlin's Case, 5 Abb. 281; Matter of Carpenter, 7 Barb. 30.

It is, nevertheless, the province and duty of the judge to examine the facts and claims of the respective parties so far as to ascertain whether the person claiming the office, and the delivery of the books and papers, shows a clear right to such office and to the possession of such books and papers, and whether or not the party refusing such delivery establishes a reasonable doubt in regard to the right of the applicant to the possession of such books and papers. It is quite obvious that the legislature never intended that such remedy should be defeated, and an officer deprived of the possession of the books and papers of an office to which he has been regularly elected or appointed, simply because another party claims to retain the same upon grounds which are frivolous or creating no reasonable doubt in regard to the right of such officer.   Such a construction would

render the statute meaningless and useless. *People* v. *Allen, supra; Matter of Carpenter, supra.*

Having said thus much in regard to the extent to which such conflicting claims should be examined under this statute, it remains to be considered, whether, upon all the facts submitted upon this application, Mr. North is entitled to the order for which he applies. North was appointed chamberlain by the common council, at a regular meeting thereof, held on the 13th day of March, 1874, at which Mr. Bogue, the mayor, presided, and declared the result. It is not disputed but that Mr. Cary was entitled to the custody of such books and papers until his successor in office should be regularly appointed, and give the requisite security. Section 21 of title 3 of the charter of said city (Laws 1869, chap. 912) provides that before the chamberlain shall enter upon the duties of the office, he shall execute and file with the clerk a bond in the penalty of at least the amount of the general city taxes, and that sureties thereto *shall be approved by the mayor and common council,* conditioned that he will faithfully discharge the duties of the office, and pay over all moneys received by him. I am of opinion that a fair and reasonable construction of said provision leads to the conclusion that the approval of the bond was indispensable to North's legal right to enter upon the duties of such office. The reason for the rule is quite apparent in this particular case, because as chamberlain he would become the financial officer of the city, and as such entitled to the custody of its finances to a very large amount. The bond was incomplete until approved by proper authority. Who then could approve the same according to the charter? Section 21, above referred to, declares that it shall be approved *by the mayor and common council.* Title 4 of the charter provides that the mayor shall be the chief executive officer of the city, and defines his duties, some of which are to be discharged in conjunction with the common council when in session ; others to be performed independently of that body. Section 1 of title 5 declares that the mayor and aldermen of the city shall constitute the common council. Whatever duties are discharged by the mayor when in actual session with the aldermen he performs as a part of the common council. We have seen that said section 21 requires the approval of the sureties to such bond not by the *mayor and aldermen,* but by the *mayor and common council,* which last-named body is declared by the charter to be composed of the mayor and aldermen. The approval by the common council,

constituted as above stated, would fulfill the requirement of the charter so far as the approval by the common council was concerned. But one further act is required to render such bond complete, viz.: the approval by the mayor. It is quite clear to my mind that the legislature intended to confer this duty upon him, not as a member of the common council, but as the chief executive officer of the city, acting independently of such common council, and in or out of the council chamber, as he might choose. We can readily perceive a reason for such requirement. The chamberlain being made by the charter the custodian of all the money belonging to the city derived from taxes imposed, it may reasonably be inferred that the law-makers would be vigilant to provide, that adequate security should be given by such financial officer to protect the city against loss ; and that in determining the sufficiency of the sureties to his bond not only the judgment of the common council, declared by its resolution, should be required, but in addition thereto, the deliberate and independent judgment of the mayor should also be required. As a member of the common council he would have no opportunity to express his approval or disapproval by a vote, unless there happened to be a tie. I therefore conclude that to render the bond effective it was necessary that the mayor, as such executive officer, should approve the sureties; and that, too, independent of the common council. It is contended by the counsel for North that the mayor, being absent from the meeting of the aldermen on the 18th of March at which the bond was attempted to be approved, although] at the time in the city, it was competent for Mr. LeRoy, who was an alderman and appointed at that meeting to preside in the absence of the mayor, to approve of the sureties to said bond as mayor *pro tem.*, and that such approval answered the requirements of the charter in that particular. Section 6 of title 5 of the charter provides as follows : " Whenever the mayor shall be absent from the city, or from any meeting, the aldermen may appoint one of their number *mayor for the time being,* who shall hold office until the mayor returns, but shall *vote as an alderman,* and not have the casting vote or the power of veto." In my judgment this provision refers merely to the organization of the meetings of the common council, by enabling the aldermen, in the absence of the mayor, to appoint a presiding officer for the time being, and was not intended to authorize the aldermen to appoint a mayor to discharge all the duties which the charter devolves upon

such officer. It will be observed that title 5 of the charter provides for the organization of, and prescribes the duties of, the common council; and said section 6 of said title has reference merely to organizing and conducting the meetings of such body, and that portion of the section above quoted was obviously designed to enable the aldermen to appoint a presiding officer of the meeting of the common council, in the absence of the mayor from such meeting; and so far from conferring upon such officer thus appointed, all the powers which the mayor possesses by virtue of the charter, the section restricts him in the exercise of some of the powers ordinarily possessed by a presiding officer, by depriving him of the casting vote in case of tie. Such officer is not allowed to exercise the veto power, but may vote as an alderman. It is conceded that the mayor was in the city of Cohoes at the time the meeting of the 18th of March was held, and the bond was not presented to him for approval. Suppose after the approval of the bond by the resolution of the common council, it had been presented to the mayor outside of the council chamber, and he had approved it, even while such body was in session, could it be fairly doubted but that his approval would be valid? If so, and the theory contended for by the counsel for North is sound, the stranger anomaly is presented of two officers, one elected by the people and the other appointed by the aldermen; and both at the same time in the city, and both authorized to perform an act which is conferred by the charter upon the mayor, not as a member of the common council, and not necessary to be performed during its session, or as a part of its proceedings. Surely no such result was ever intended to be produced by the law makers. Even if the language employed in framing the charter might admit of such a construction, it is not in accordance with the spirit and intention, as fairly derived from the charter viewed in the light of the objects sought to be attained by its enactment, and the latter construction should prevail. In *Tonnele* v. *Hall*, 4 N. Y. 144, Judge JEWETT remarks: "It is a sound principle that such a construction ought to be put upon a statute as may best answer the intention which the makers had in view; and that is sometimes to be collected from the cause or necessity of making it at other times from other circumstances. Whenever the intention can be discovered, it ought to be followed with reason and discretion in its construction, although

such construction may seem contrary to its letter." See, also, *Wes* v. *McGurn*, 43 Barb. 198 ; *James* v. *Patten*, 6 N. Y. 9.

I conclude that the appointment of North was not affected by the veto of the mayor. The veto power is conferred upon the mayor by section 19, title 4 of the charter, and the provision upon that subject is as follows: "He shall have the power to veto any resolution or ordinance of the common council." It is not pretended but that North received the number of votes of the members of the common council required for his appointment. The proceeding at which the veto was aimed *was an appointment to office*, and not a resolution or ordinance adopted in the transaction of the ordinary business of the common council. This distinction can be more readily conceived than accurately described. When we speak of an appointment to office a very different idea is conveyed to the mind than when the mere adoption of a resolution or ordinance by a public body is spoken of. It is proper for us to inquire again, what was the intention of the legislature in this particular? Was it the design to confer upon the mayor such control over appointments to office made by the common council as would necessarily follow if the veto power was possessed by the mayor to the extent claimed by him ? If he possesses the power to the extent claimed, then the mayor may, by veto, necessitate a vote of two-thirds of all the members of the common council to make a valid appointment to office. Section 1, of title 4 of the charter, after conferring the veto power upon the mayor, proceeds as follows: "The common council may at their next regular meeting proceed to reconsider the same; *if two-thirds of all the members elected then agree to pass the same*, it shall take effect as a law."

The language thus employed seems inappropriate, when applied to an appointment to office, but quite proper when applied to an ordinary resolution or ordinance. But aside from the technical language employed it seems quite clear from the charter and the nature of the proceeding that no such power was intended to be conferred upon the mayor. The result would be, possibly and even probably, to deprive a party of an office, by such indirect means, by requiring a two-third vote to overcome the veto of the mayor, when only a majority vote would make the appointment in the first instance. The adjudications to which we have referred justify a construction which seems in accordance with the intention of the

law makers in framing the charter. See, also, *Ackley's Case*, 4 Abb. 35.

It is further contended that the meeting of the common council of March 18, at which the bond was approved by that body, was irregular, not having been held pursuant to an adjournment, or the call of the mayor, or three aldermen, as required by the charter for a special meeting. The answer made to this position is, that such meeting was held at the time and place specified in the rules of the common council adopted in 1872, and not subsequently changed or vacated, but, on the contrary, adhered to in 1872 and 1873. The question thus presented for determination is, whether these rules and regulations adopted by the common council as to all subjects and for all purposes cease to have any binding force, when the terms of office of the members of said body, who adopted such rules expire, although other persons are elected to fill their places.

The common council continues from its first organization until the charter expires, although the individual members thereof change. Section 6 of title 5 provides as follows: "The common council shall determine the rules of its own proceedings." Section 5 of title 5 provides: "The common council *shall hold stated meetings at least once in each month,* and the mayor or, in his absence, any three aldermen may call special meetings by notice in writing served personally upon the other members of the council, or left at their usual place of abode." It is not left to the common council to fix the number of *the regular meetings;* by the charter they must hold at least one each month. They are authorized to designate the day of the month on which such meetings shall be held. That was done by rule adopted by the common council in 1872, and followed during that year and also in 1873 without adopting a new rule. Nor did the common council as at present constituted, at the annual meeting or at any adjourned meeting of the present year, make any change in regard to the time of holding the regular monthly meetings. It may therefore be fairly assumed that the appointments of the common council made in 1872 and subsequently followed were in effect adopted by that body as at present constituted, and will continue until changed by a new rule. So long as such appointments continued satisfactory, as to the time of holding the regular meetings, it would seem a useless ceremony to repeat the appoint

ment by entering a new rule upon the minutes, when no change as to the time of holding such meetings was desired.

No provision of the charter in express terms requires a new appointment, and a rule entered upon the minutes. When the rule was adopted in 1872 fixing the time of holding the meetings, I think it continued in force until changed. At all events such rule should be considered, under the circumstances, in force by adoption, as the common council have not changed the same, although several meetings have been held at which such change might have been made. It would be a great hardship to hold that all the monthly meetings held since 1872 are irregular, because a new rule has not been entered from year to year. This question does not involve the determination — whether when a common council, composed of one set of members, enter upon the performance of a piece of business, and fail to complete it before the terms of office of its members expire, the same common council, composed of members newly elected, can complete such unfinished work.

The two cases suggested should not be confounded, as they are entirely different. The common council locates the place of holding its regular meetings, and, year after year, continue to occupy the same building, and it would seem to be an idle ceremony to enter a rule upon its records every year that the regular meetings would be held at such place. The same principle should apply in regard to the time of holding the monthly meetings. There is certainly no hardship in such a construction, and I think it should be adopted.

Mr. North is not entitled to the order for which he applies, because he has omitted to present the bond to Mayor Bogue for his approval; and until such approval of the sureties he is not entitled to the possession of the books and papers of the office. The proceedings are therefore discharged. It is to be hoped that this unfortunate controversy in regard to the government of the city may terminate, as it can but prove disastrous to all its interests, if continued, and reflect no credit upon those engaged in the struggle. The welfare of the entire community should be regarded paramount to mere individual interest, prejudice, or feeling.

*Application denied.*