THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* ALFRED L. RUTHVEN, Defendant.

City Court of Rochester, Criminal Branch, May 29, 1936.

*John J. Bennett, Jr., Attorney-General [George R. Van Alstyne, Assistant Attorney-General,* of counsel], for the plaintiff.

*Maurice J. Kaman,* for the defendant.

TOMPKINS, J. The information charges that the defendant, a dealer, sold to the public within this State, as principal, certain securities without having caused to be filed in the Department of Law of the State of New York a statement known as a " dealer's statement," in violation of subdivision 2 of section 359-e of the General Business Law, prohibiting dealer, as principal, broker, or agent, or otherwise, from so selling.

Upon the hearings, five witnesses were called on behalf of the prosecution. Four of these witnesses had been stockholders in the corporation in question, the Union Simplex Train Control Company, Inc., for some ten to fifteen years. Each had received stock in the corporation from the defendant within two years prior to the laying of the information on February 27, 1936. One witness,

Faith Norton, received several certificates of stock from the defendant during the year 1933.

In 1933, and during the period covered by the delivery of stock by the defendant to the other stockholders, the corporation was engaged in litigation in the District Court of the United States, seeking to recover from the defendant therein upon an alleged infringement of a patent it owned. All of these stockholders, except one, understood, at the time they turned over money to the defendant, and for which they later received stock in the corporation, that the money was needed by the corporation and was to be used by it in carrying on the litigation in question.

The witness Griswold testified: "A. Our idea was the ones that was helping and acted in fighting this infringement suit would be protected as far as possible. Q. Isn't it true, doctor, that this money paid over by you to Mr. Ruthven or to the corporation was intended as a loan to the corporation for the purposes of defraying the expenses of this patent litigation? A. Yes sir, absolutely."

When Miss Wagg was questioned in respect to what the money was to be used for, she answered: "As I said, it was given for carrying on the Buffalo trial. He needed money for the trial and it was up to the stockholders to contribute and get it in."

The witness Nicholson was asked:

" Q. Did Mr. Ruthven, at that time, tell you in words or substance that money was required to defray the cost and expenses of this lawsuit that was pending in Federal Court? A. Yes."

Do these transactions constitute a violation of subdivision 2 of section 359-e, as charged in the information? The defendant did not file the required " dealer's statement " with the Department of Law. Was he engaged in the " business of trading in securities " so, as a part thereof, such securities he dealt in were sold " to the public in this State? "

It does not appear in what business the defendant was engaged, except that he was the president of the Union Simplex Train Control Company, Inc. This corporation was then engaged in litigation in the Federal court over an alleged infringement of some of its patents. Money was needed to prosecute the lawsuit. The president went to certain of the stockholders. Five put in more money and received stock therefor. All but one of these five knew it was for the litigation.

Was the president of the corporation, in thus obtaining money for the corporation from its stockholders to finance the pending litigation and giving them stock as security for their advances, engaged in selling securities " to the public ?" There is no evidence

of any general offering of the stock, of any advertising its sale generally.

What is meant by the term " to the public," as used in section 359-e? Are these words of limitation, or are they merely surplusage?

The purpose of the so-called " Martin Act " is to prevent fraud in the sale of securities and to defeat wildcat schemes in relation thereto, whereby the public might be fraudulently exploited. (*People* v. *Federated Radio Corp.*, 244 N. Y. 33, 38.) It is the generally unsuspecting and frequently gullible public that is to be protected. Who are the " public? " The term as used herein does not seem to have been defined by the courts of this State.

Section 352 of the act authorizes the Attorney-General to investigate. It deals specifically with all *fraud* and *fraudulent practices* in the sale of securities when made within the State. The phrase " to the public " is not mentioned. It also includes sales made in violation of section 359-e.

Section 353 authorizes an injunction against those who have or are about to engage in fraudulent practices " from continuing such fraudulent practices." Where the defendant has *actually been guilty* of *fraudulent practices*, he may be permanently enjoined from selling securities " to the public within this State." It thus appears that where *fraud* or *fraudulent* practices are involved, investigation and prosecution follow, whether or not the sales were made " to the public."

The gist of the offense defined by section 359-e is selling " to the public." Fraud or fraudulent practices form no part of this offense. The evident purpose of its provisions is to give the Department of Law a chance to check up upon both the securities and the dealer who is about to offer the same " to the public."

If *fraud* is involved in the sale, the Department of Law may prosecute the seller or dealer under section 353, but not under section 359-e. While the offense of selling stock " to the public " without having filed the required statement, although denominated a misdemeanor, is a felony, being punishable by imprisonment for two years and a fine of $5,000 (*People* v. *Bellinger*, 269 N. Y. 265, at p. 269), the court, in so holding, did not consider it a grave crime or one involving serious moral turpitude, saying: " Of course no court would ever impose such an outrageous penalty for so slight an offense."

It is urged that, inasmuch as section 359-e provides that certain enumerated sales shall not be included in sales " to the public," then all other sales are sales " to the public," and, therefore, are prohibited. If this construction be adopted, then the term " to the public " becomes surplusage. For this reason: Had the statute pro-

vided that *all* sales of securities with these specified exemptions are prohibited where the dealer has not filed the required statement, then, of course, *every other* sale not specifically exempted would be prohibited. But the statute does not provide that *all* sales of securities are prohibited, but only those sales made " to the public " with the specified exemptions. Therefore, sales not exempted, in order to be prohibited, still must be sales " to the public," unless that term is to be held mere surplusage.

The phrase " to the public " may not be elided from the statute as surplusage. As was said by Lord COKE: " The good expositor * * * gives effect to every word of the statute; he does not construe it so that anything should be vain and superfluous." (Quoted in *Palmer* v. *Van Santvoord*, 153 N. Y. 612, 616.) " In the attempt to ascertain the intention of the Legislature, it is a just rule, always to be observed, that the court shall assume that every provision of the statute was intended to serve some useful purpose." (*Allen* v. *Stevens*, 161 N. Y. 122, 145.)

The words " to the public " have a place in the statute; they are there, wisely or unwisely, for the purpose of describing or limiting to whom sales are made or offered. What is their meaning and application? Until statutory terms have been defined or construed differently, they must be taken as they are commonly used and understood. They must be given their natural and ordinary signification (*James* v. *Patten*, 6 N. Y. 9, 13) unless it appears that the lawmakers meant they should be given either a narrower or a broader application. (*Gilmore* v. *City of Utica*, 121 N. Y. 561, 568.) They are to be taken in their ordinary popular meaning unless the contrary appears. (*Matter of Boulevard Theatre & Realty Co.*, 195 App. Div. 518, 520; *Matter of Ives*, 155 id. 670, 674.)

What is the ordinary signification of the term " public? " We commonly think of it in terms of people; as inclusive of all the people and inhabitants; not as exclusive, nor as a limited part or portion of the people.

Bouvier Law Dictionary defines the term as: " The whole body politic, or all the citizens of the state." 32 Cyc. 747 defines the term as: "All the inhabitants of a particular place; the body of the people at large; the people of a neighborhood; the community at large; the people; the whole body politic or all the citizens of the State," citing cases in support of each defining clause.

The Colorado Supreme Court, in *Wyatt* v. *Larimer & W. Irr. Co.* (1 Colo. App. 480; 29 P. 906), stated " public " and " people " are synonymous. In *Cawker* v. *Meyer* (147 Wis. 320; 133 N. W. 157) the court quotes the Century Dictionary to the effect that " public " means of or belonging to the people at large; not limited

to any particular class of the community. In *Robertson* v. *Business Boosters' Country Club* (210 Ala. 460; 98 S. 272, 274) the court held, where there was no general advertising or " other form of public offering," the sale of stock to the plaintiff may have been by personal solicitation and was not a violation of the Alabama act.

But one case has been called to our attention involving a violation of subdivision 2 of section 359-e of the General Business Law. In *Sajor* v. *Ampol, Inc.* (242 App. Div. 655), a sale of securities from the defendant to the plaintiff was held invalid, for the reason that the defendant had failed to file the required statement with the Secretary of State (now with the Department of Law). While the question of selling " to the public " was not discussed, it appears from the record that, at the time the sale of the defendant's stock was made by its president to the plaintiff, there had already been sold $39,100 worth; that the stock had been advertised generally in a newspaper; and that the president of the defendant had written the plaintiff " so far there are over thirty stockholders  *  *  *. If you know of *anyone* who you think would be interested, kindly give me the names and addresses."

Clearly, here was a sale, and an offering to sell, of the defendant's stock, " to the public."

The sales made by the defendant, if they may be deemed sales, were to five stockholders of the corporation to aid financing the pending litigation. Were these sales, by the president of the corporation to these stockholders, sales " to the public? " The object of the statute is to protect the public from being exploited by wildcat, fraudulent schemes. While these stockholders are a part of the public, they do not constitute the public. They are in a different position from non-stockholders. They already have an existing interest to support and conserve. Sales limited, as were these, to those already having an interest to protect, and made to further such interest, are not sales " to the public " within the meaning of the statute, where there was no public advertising; no general offering. No fraud is charged or shown, which could have been prosecuted under section 353. Under these circumstances, the statute was not violated. No offense was committed.

The evidence on the part of the prosecution has been very fully and completely presented. Its position has been ably set forth in the brief of the Attorney-General.

The information must be dismissed.