OTIS H. BALLOU ET AL., APPELLANTS, V. EDWIN H. SHERWOOD, APPELLEE.

[FILED SEPTEMBER 15, 1891.]

1. The Statute of Frauds only requires the vendor to sign the contract or memorandum thereof, for the sale of lands. (*Gartrell v. Stafford*, 12 Neb., 545.)

2. Real Estate: CONTRACT TO EXCHANGE: PROOF: VARIANCE IN TERMS. S. and B. entered into a written contract for the exchange of certain real estate, and in addition to the parcels to be conveyed by B. he also agreed to pay S. $25,000 in cash down, and deliver to him certain shares of stock of the Midland Guarantee and Trust Company. After the execution of the contract S. stated to B. that he had negotiated a loan of $25,000 from C. upon the property agreed by the contract to be exchanged with

Ballou v. Sherwood.

and conveyed to B., but that the money had not been received nor the mortgage executed, and suggested that as B. had to make a loan of $25,000, under his contract with S., that he carry out the arrangement agreed upon for the loan between S. and C. This was agreed to by B. Upon consultation with C., he, being ready to advance the money, required the interest to run from that day, and as the deeds could not be prepared and exchanged between B. and S. until a later day, by mutual consent S. executed a mortgage to C. and received the $25,000 directly from him, as the cash payment of that sum on the contract for the sale and exchange of land with B. In an action by B. for the specific performance of the contract against S., *held*, that said transaction was no variance of the contract for the exchange of land; nor did proof of it tend to establish the contract by parol, but only to prove the performance of certain conditions of the contract, the cash payment provided by it.

3. ———: ———: DESCRIPTION CONSTRUED. In a contract between E. H. S. on the one part, and O. H. B. and E. G. B. on the other part, for the exchange of one parcel or description of real property by S., for five parcels or descriptions of real property by the second party, in which the property to be exchanged by each party was described as follows: "E. H. S.'s barn and lot, 17 and Davenport; B.'s lot 2, B. 174; east half lot 5 and 6, B. 80, Omaha; twenty acres adjoining Cote Brilliante, Douglas county; N. ½ B. 1, Ambler Place; lot 14, B. 5, and lot 11, B. 2, Boggs and Hill's addition, Omaha," *held*, that each description of property to be exchanged by the parties, following the first description, is to be construed and read as B. the owner of the property, in the possessive case, at the commencement of each description.

4. ———: ———: PAROL EVIDENCE: STATUTE OF FRAUDS. O. H. B. and E. G. B. contracted in writing to convey real property by the description of "B.'s lot 14, B. 5, and lot 11, B. 2, Boggs and Hill's addition, Omaha." Upon proof of two additions known as Boggs and Hill's, one of which was known as Boggs and Hill's second addition, that the B.'s owned lot 14 in block 5, and lot 11 in block 2 in Boggs and Hill's second addition, but did not own or claim to own any lots or lot in the other addition, *held*, that the contract was not void under the statute of frauds; and *held*, also, that parol evidence was properly received to prove the ownership by the B.'s of lots answering the general description contained in the contract.

5. ———: ———. THE SEVERAL DESCRIPTIONS of real property to be exchanged by the B.'s, as set out in the contract copied in the statement, *held*, sufficient to admit parol evidence of the cor-

rect description of the respective parcels intended. (See *Adams v. Thompson*, 28 Neb., 54, and authorities there cited.)

6. **Estoppel.** Where a party gives a reason for his decision and conduct touching anything involved in a controversy, he is estopped after litigation has begun from changing his ground and putting his conduct on another and different consideration. (*Railway Co. v. McCarthy*, 96 U. S., 258, and cases there cited.)

7. **Statute of Limitations :** Operation Not Arrested. Where plaintiffs * * * claim title through their father, deceased, and it appears that the statute of limitations began to run against him during his lifetime, his death and their minority do not arrest it, and if it has run the full statutory period, the possession of the defendant being actual and adverse from the ·beginning, plaintiffs are barred of their right to recover. (*Hardy v. Riddle*, 24 Neb., 670.)

8. **Adverse Possession :** Specific Performance. Open, notorious, exclusive, adverse possession of real estate by one claiming to be the owner thereof will give a perfect title thereto, as well for the purpose of enforcing the specific performance of a contract for the sale thereof, as for all other purposes of ownership.

APPEAL from the district court for Douglas county. Heard below before WAKELEY, J.

*Cowin & McHugh,* and *O. H. Ballou,* for appellants:

Mutuality in the contract is established where one party only signs. (*Miller v. Cameron,* 15 Atl. Rep. [N. J.], 842; *Justice v. Lang,* 42 N. Y., 493; *Thayer v. Luce,* 22 O. St., 62; *Clason v. Bailey,* 14 Johns. [N. Y.], 484; *Gartrell v. Stafford,* 12 Neb., 552; *Lowber v. Connit,* 36 Wis., 176; *Laythoarp v. Bryant,* 2 Bing. [N. C., Eng.], 736*; Fry, Spec. Per. of Cont., 201, 202; *Morin v. Martz,* 13 Minn., 191; *Brumfield v. Carson,* 33 Ind., 94; Reed, Stat. of Frauds, sec. 359; *Eiseley v. Malchow,* 9 Neb., 174; *Connor v. Hingtgen,* 19 Id., 472; *Burt v. Wilson,* 28 Cal., 632; *Ogden v. Ogden,* 4 O. St., 182; *Switzer v. Skiles,* 3 Gil. [Ill.], 529; *Talbot v. Bowen,* 10 Am. Dec. [Ky.], 747; *Worrall v. Munn,* 5 N. Y., 229; 2 Kent. Com., 510; *McCrea v. Purmont,* 16 Wend. [N. Y.], 460; *Old Col. Ry.*

*Corp. v. Evans,* 6 Gray [Mass.], 25; *Barstow v. Gray,* 3 Greenl. [Me.], 409; Brown, Stat. of Frauds, sec. 366.) A contract in writing may be applied to its proper subject-matter by oral evidence. (*Butler v. Davis,* 5 Neb., 521; *Watson v. Baker,* 9 S. W. Rep. [Tex.], 867; *Sanborn v. Nockin,* 20 Minn., 178; *Mansfield v. Hodgdon,* 17 N. E. Rep., [Mass.], 544; *Thayer v. Luce,* 22 O. St., 62; *Marriner v. Dennison,* 20 Pac. Rep. [Cal.], 386; *Black v. Pratt Coal Co.,* 5 S. Rep. [Ala.], 89; *Prater v. Miller,* 3 Hawks [N. Car.], 628; *Wiswall v. McGowan,* 1 Hoff. Ch. [N. Y.], 126.)    The description of the property is sufficient. (*Bradley v. Packet Co.,* 13 Pet. [U. S.], 89; *Vindquest v. Perky,* 16 Neb., 284; *Connor v. Hingtgen,* 19 Id., 472.)    The statute of frauds must be pleaded specially. (*Eiseley v. Malchow,* 9 Neb., 174; *Gillespie v. Moon,* 2 Johns. Ch. [N. Y.], 585; *Steele v. Russell,* 5 Neb., 212; *Blanchard v. Jamison,* 14 Id., 244; *R. Co. v. Hayes,* 13 Id., 491; *Jenkinson v. Monroe,* 39 N. W. Rep. [Mich.], 854; *Russell v. Rosenbaum,* 24 Neb., 769; *Curtis v. Cutler,* 7 Id., 318; *Gibson v. Parlin,* 13 Id., 292.)    Adverse possession is established against Crawford and his heirs.    (*Hardy v. Riddell,* 24 Neb., **670**.)

*A. J. Poppleton,* and *Lake & Hamilton, contra,* cited, as to the signatures required by the statute of frauds: *Worrall v. Munn,* 1 Seld. [N. Y.], 244; *Ballard v. Walker,* 3 Johns. Cases [N. Y.], 60; *Roget v. Merritt,* 2 Caines [N. Y.], 120; *Clason v. Bailey,* 14 Johns. [N. Y.], 486, and cases; *Gartrell v. Stafford,* 12 Neb., 552; *Becker v. Mason,* 2 Pac. Rep. [Kan.], 850; *Grafton v. Cummings,* 99 U. S., 100; *Connor v. Hingtgen,* 19 Neb., 472.    As to the first formal point discussed in the opinion: 2 Story's Eq., secs. 151–2, 770; *Glass v. Hulbert,* 102 Mass., 24; *Elder v. Elder,* 10 Me., 80; *Osborn v. Phelps,* 19 Conn., 83; *Westbrook v. Harbeson,* 2 McCord's Eq. [S. Car.], 112*; *Best v. Stow,* 2 Sandf. Ch. [N. Y.], 292; *Henkle v. R. E. A.,* 1 Vesey

[Eng.], 317; *Motteau v. L. A. Co.*, 1 Atk. [Eng.], 545. As to the second formal point discussed in opinion : *Hamilton v. Harvey*, 121 Ill., 469; *Hammer v. McEldowney*, 46 Pa. St., 334; *Eggleston v. Wagner*, 10 N. W. Rep. [Mich.], 37; *Ryan v. Davis*, 6 Pac. Rep. [Mont.], 341; *Nippolt v. Kammon*, 40 N. W. Rep. [Minn.], 267; *Holthouse Appeal*, 12 Atl. Rep. [Pa.], 340; *Waters v. Baker*, 9 S. W. Rep. [Tex.], 867; *Preston v. Preston*, 95 U. S., 202; *Capps v. Holt*, 5 Jones Eq. [N. Car.], 153; *Jordan v. Fay*, 40 Me., 130; *Bowers v. Andrews*, 52 Miss., 596; *Fulton v. Robinson*, 55 Tex., 404; *Johnson v. Granger*, 51 Id., 42; *Baldwin v. Kerl*, 46 Ind., 433; *Miller v. Campbell*, 52 Id., 127; *Mathews v. Jarrett*, 20 W. Va., 415; *Westfall v. Cottrills*, 24 Id., 263; *Blankenship v. Spencer*, 7 S. E. Rep. [W. Va.], 433; *Dobson v. Litton*, 5 Cold. [Tenn.], 616; *Holmes v. Evans*, 48 Miss., 247. As to the fourth formal point discussed in the opinion : *Taylor v. Williams*, 45 Mo., 80; *Powell v. Conant*, 33 Mich., 396; *Pratt v. Eby*, 67 Pa. St., 396; *Littlefield v. Tinsley*, 26 Tex., 352; Pomeroy, Spec. Perf., sec. 203; *Jeffries v. Jeffries*, 117 Mass., 184; *Dobbs v. Norcross*, 24 N. J. Eq., 327; *Adams v. Valentine*, 33 Fed. Rep. [N. Y.], 1; *Pyrke v. Waddingham*, 10 Hare [Eng.], 1; *Swayne v. Lyon*, 67 Pa. St., 436; *Griffin v. Cunningham*, 19 Gratt. [Va.], 571; *Park Comr's v. Armstrong*, 45 N. Y., 234; *Palmer v. Morrison*, 10 N. E. Rep. [N. Y.], 144; *Butler v. Davis*, 5 Neb., 521; *Lowes v. Lush*, 14 Vesey [Eng.], 547; *Seaman v. Vawdrey*, 16 Id., 390; *Mullins v. Aikens*, 1 Heisk. [Tenn.], 535; *Fryer v. Rockafelder*, 63 N. Y., 268; *Ludlon v. O'Neil*, 29 O. St., 181; *Horbach v. Miller*, 4 Neb., 47; *Pettit v. Black*, 13 Id., 153; *Tussel v. Lewis*, Id., 417; *Gatling v. Lane*, 17 Id., 79–83; *Haywood v. Thomas*, Id., 240; *Galligher v. Connell*, 23 Id., 402; *Close v. Stuyvesant*, 24 N. E. Rep. [Ill.], 873; *Moore v. Williams*, 22 N. E. Rep. [N. Y.], 233; *Vought v. Williams*, 24 Id., 197; *In re La Due*, 54 N. Y., 528; *Richmond v. Koenig*, 45 N. W. Rep. [Minn.], 1093; *Fairchild v. Marshall*, 42 Minn., 14.

COBB, CH. J.

The plaintiffs and appellants filed their amended and supplemental petition in the court below, alleging that on December 10, 1887, the defendant was the owner in fee of lot 4, and the west one-third of lot 3, in block 77, in the city of Omaha; that on said date, and prior thereto, the plaintiffs were the owners in fee of lot 2, in block 174, and the east half of lots 5 and 6, in block 80, in the city of Omaha; also twenty acres of land adjoining Cote Brilliante, an addition to the city of Omaha, and described as follows: Beginning at the southwest corner of section 29, township 16, range 13 east, thence east 32 rods, thence north 66⅔ rods, thence east 48 rods, thence north 13⅓ rods, thence west 80 rods, thence south 80 rods to the place of beginning, being part of the southwest quarter of the southwest quarter of section 29, township 16 north, range 13 east, of the 6th P. M.; that the premises last described was well known to the defendant when the contract was entered into as hereinafter stated, and he knew exactly the property designated in the agreement as such twenty acres, and as being the only property owned by plaintiffs at that place; also the north half of block 1, in Ambler Place, an addition within the city limits of Omaha, and lot 14, in block 5, and lot 11 in block 2, in Boggs and Hill's second addition to the city of Omaha, described in the contract as "Boggs and Hill's addition," the word "second" being left out by mistake, but is the property contemplated and bargained for by defendant.

The plaintiffs were also the owners of stock in the Midland Guarantee and Trust Company, a corporation organized under the laws of this state; that on December 10, 1887, said parties entered into a contract in writing whereby it was agreed that the defendant should sell and convey to the plaintiffs the property described as belonging to him in consideration of $25,000 in cash, and $3,100 stock in the Midland Guarantee and Trust Company, and take the

other property described as plaintiffs' as the balance of the consideration for defendant's property agreed to be sold and exchanged, the consideration for which, described in said written contract, was $115,000. The amount to be paid by defendant for lot 2 in block 174 was $40,000, from which was to be deducted $14,500, the amount of a mortgage incumbrance assumed by defendant, the equity of the plaintiffs therein being valued by the parties at $25,000; the amount paid by defendant for the east half of lots 5 and 6, in block 80, was $20,000, upon which there was a mortgage of $5,600, assumed by defendant, the equity of the plaintiffs being valued at $14,400 and agreed upon between the parties. The twenty acres described was taken at the agreed value of $12,000; the north half of block 1, in Ambler Place, at the agreed value of $20,000; the lots in Boggs and Hill's second addition at $17,100, upon which there was a mortgage of $2,100, the equity of the plaintiffs being valued at $15,000. All the property was taken by the defendant from plaintiffs subject to the incumbrances as aforesaid, the equities of the plaintiffs therein being calculated to make the sum of $115,000. All of which agreement, bargain, and contract were entered into, in writing between the parties thereto on December 10 1887, copies of which are attached marked A and B; that on said date there was paid on said contract $2,000, a reasonable time being agreed upon between the parties to execute deeds, and complete the exchange and purchase.

The plaintiffs proceeded immediately to perfect said contract and executed warranty deeds of conveyance, excepting the incumbrances assumed by defendant and subject to which the property was taken; that on the same day the contract, after being signed, was changed in this respect: The defendant had been negotiating for a loan upon his property described of $25,000, and being notified that the money was ready, it was agreed that the defendant might make the loan, to be assumed by the plaintiffs, who would

take the property subject to the amount of the loan in lieu of the payment of that amount in cash; the defendant thereupon executed a mortgage for $25,000 in favor of John D. Creighton, which was assumed by these plaintiffs. They further allege that they perfected all title to said property, and tendered deeds of conveyance therefor before the commencement of this suit, and are ready and willing to deliver the same, and have them in court for that purpose. They further allege that they tendered the stock aforesaid to the amount of $3,100, being at the rate of fifty per cent of the par value of said stock, the same being $6,200, which they are now ready and willing to deliver to the defendant upon his performing his part of the agreement hereinbefore set forth. They further allege that some question having arisen as to the title of the north half of block 1, Ambler Place, they proceeded at once to secure certain deeds perfecting said title beyond question, though such deeds were not necessary to make such title good. They were secured after the commencement of this suit, to-wit, deeds from Catharine Beard and her husband, James Beard; Harry A. Beard and wife; Minnie E. O'Neill, *née* Beard, and her husband; Penelope Campbell, *née* Ambler, and her husband; all of which deeds conveying the interests of the grantors in said north half of block 1, Ambler Place, Douglas county, Nebraska, running to a grantor by warranty deed to the plaintiffs from the parties, and all being now of record, making the title in the plaintiffs good beyond question. Before and since the commencement of this suit, the plaintiffs have requested the defendant to convey the premises to them, by him contracted, and sold, and exchanged to them as described, according to the terms of said agreement, but the defendant has at all times refused, and still refuses, to execute and deliver such conveyance, and to transfer the property to these plaintiffs; and they allege that they have performed all the conditions of said agreement on their part.

45

The plaintiffs pray that the defendant be required to receive the consideration so tendered, and to execute and deliver to plaintiffs a deed of conveyance of said premises, with covenants of general warranty, except as to said mortgage of $25,000, assumed by plaintiffs, and for special relief reforming the contract in regard to the mistake in omitting the word "*second*" before the word "addition," in the Boggs & Hill addition property described, as such was the intention of the parties, the mistake being mutual.

"Exhibit A.

"Omaha, Nebraska, December 10, 1887.

"Memorandum of exchange of real estate and personal property, between E. H. Sherwood and O. H. Ballou, and E. G. Ballou.

| | | | |
|---|---|---:|---:|
| E. H. Sherwood's barn and lot, Seventeenth and Davenport | | | $115,000 |
| Ballou's lot 2 in 174 | $40,000 | | |
| Less | 14,500 | | |
| | | $25,500 | |
| East half lots 5 and 6, B. 80, Omaha | $20,000 | | |
| Less | 5,600 | | |
| | | 14,400 | |
| Twenty acres adjoining Cote Brilliante, Douglas county, | | 12,000 | |
| North half block 1, Ambler Place | | 20,000 | |
| Lots 14 B. 5, and 11 B. 2, Boggs & Hill's Addition to Omaha | $17,100 | | |
| Less | 2,100 | | |
| | | 15,000 | |
| Cash | | 25,000 | |
| Balance in Midland Guarantee & Trust Company stock at 50 cents | | 3,100 | |
| | | | $115,000 |

"(Signed)    E. H. Sherwood.
"O. H. Ballou."

"Exhibit B.

"Omaha, Nebraska, December 10, 1887.

"Received of O. H. and E. G. Ballou, two thousand dollars, as part payment purchase money on lot four and west third of lot three, block seventy-seven (77), Omaha, Douglas county, Nebraska, in accordance with a certain memorandum of sale and exchange of properties this day made between the said Ballous and myself, in the hands of C. Hartman.    All titles to be perfected; abstracts to be furnished by both sides.

    "(Signed)          Edwin H. Sherwood."

To which the defendant answered, denying that the plaintiffs, on December 10, 1887, were the owners of the lots of land and premises described, including stock of the Midland Guarantee and Trust Company, or that he had any personal knowledge of, or had examined the same. He admits that he signed the contract in writing set out, but that it was agreed when the same was signed that it was not to be delivered or become operative unless the title to the real estate described should be approved by Hon. George B. Lake, upon abstracts of title to be immediately furnished by plaintiffs, and that such abstracts were not approved, but were disapproved and rejected, and that he never signed any other contract for the conveyance or exchange of real or personal estate between the parties thereto. He further denies that any parol modification or change was ever made in said instrument of writing, and that the alleged change is prohibited by chap. 32 of the statutes of this state, and is void, and defendant denies every other allegation of the plaintiffs not herein expressly admitted, and says that the alleged contract was never perfected and completed, and never took effect; that the title to the premises described as to be conveyed by said plaintiffs is not free from doubt, and is not good and marketable, and is unequal, unfair, and unjust and inequitable, and ought

not to be enforced by the court.   The plaintiffs replied
denying each and every allegation in the answer contained
except wherein the same admits the allegation of the plaint-
iffs' petition.

There was a trial to the court, which found the equities
with the defendant, and dismissed the petition with judg-
ment for the defendant's costs.

The case is now brought here on appeal from this de-
cision.   In examining the case and giving my views on the
several propositions involved, I will follow the order pre-
sented by the brief of counsel for the appellee; and, first,
as to a point admitted by counsel to be one of minor con-
sideration, that the contract set up, purporting to be be-
tween E. H. Sherwood, on the first part, and O. H. Ballou
and E. G. Ballou on the other part, is signed only by one
of the parties of the second part, and while, as counsel
allege, there is doubtless a conflict of authorities as to the
sufficiency of a contract thus executed to take the case out
of the statute of frauds, that conflict has been settled in this
court by the decision in the case of *Gartrell v. Stafford,* 12
Neb., 545.   In this case, at pp. 551–2–3, the writer, Judge
MAXWELL, after quoting sec. 5, chap. 32, Comp. Stats.,
and citing the 4th sec. of the English Statutes of Frauds
and Perjuries, 29 Car. II, says, that "the law is now well
settled that under this statute the agreement need only be
signed by him who is to be charged by it," citing authori-
ties; and again, "that it is sufficient if the contract or
memorandum thereof is signed by the party to be charged,
that is by the vendor. (*R. v. C.,* 17 Neb., 673, and cases
cited at p. 679 of op. M., J.)"

Passing to those points of the argument deemed by coun-
sel of such importance as to be classified by numbers, we
find it stated, "I. That a written contract cannot be en-
larged or limited by parol and specific performance asked
upon it as thus modified by parol."   This objection doubt-
less refers to the allegation of the petition, "that on the

same day the said contract, after being signed, was changed in this respect: the said defendant had been negotiating for a loan upon the property above described of $25,000, and being notified that the money was ready, it was agreed between the parties, plaintiffs and defendant, that the defendant might make the loan upon the property for said sum of $25,000, and that the plaintiffs should assume said loan and take the property subject thereto in lieu of the payment of $25,000 in cash, and thereupon the defendant executed a mortgage upon the property for $25,000 in favor of John D. Creighton, which was assumed by these plaintiffs in lieu of said payment in cash.

It appears from the testimony of the appellee, that at the time of the execution of the contract, for the exchange of real estate and personal property, set forth, he said to O. H. Ballou that "he wanted some money out of it, and ought to have at least $25,000 in cash, to which Ballou replied that "he did not have that much in cash." Sherwood informed him that he had already negotiated with John D. Creighton for a loan on that property of $25,000; that the whole matter was then in his hands and was about consummated; that the abstracts of title had been passed on, and that he told Ballou that he could probably get the loan from Creighton on the same terms of his negotiation, and asked him at that time if he objected to paying ten per cent interest, which he was to pay, because he could not get the money anywhere else; that he had tried the investment companies, and they wouldn't loan on livery stables because such property was perishable, but Creighton had offered him the loan, and he asked Ballou if he objected to ten per cent interest, and understood him to say that "he didn't object;" that it was finally agreed that Ballou should go to Creighton and make the same loan that he, Sherwood, had negotiated, saying to Ballou, that he had an engagement with Creighton at the Paxton hotel, at 2 o'clock on that day, "then he was to see him."

The further circumstances of the loan were testified to by Sherwood, Ballou, and Creighton. There is scarcely any difference in their testimony, but as Creighton was the least interested, the substance of his evidence will be stated. He testified that he had engaged to meet Sherwood at the Paxton hotel from 11 A. M. to 2 P. M., on December 10, but could not say whether or not he was to meet Ballou; but that he did meet them both at that time. Sherwood told witness that he was then on a deal with Ballou, and asked witness if it would make any difference if Ballou would take that loan; that witness had begun an arrangement with Sherwood to loan him $25,000 on his property, and was to meet him there to give him the money, and had every arrangement made for that purpose, and, when he came in, said to witness that Ballou would be there, and asked witness if he would just as soon loan him the money, and that he was on the deal with him. Mr. Ballou came in and sat down and, in conversation, asked witness if he couldn't take less interest. After further conversation as to the rate of interest, the witness testifies that Ballou finally concluded to take it at that rate, if the deal went through all right; that witness had the check there to hand to him, when they said they could not get the exchange in shape before Monday, but witness replied that he wanted his interest to go on from that day; that Sherwood remarked, repeating it three times, that the papers could not be got up before Monday; that it would depend on Judge Lake's decision, who was to look the papers all over; that after some conversation between Sherwood and Ballou about some of the property being in litigation, Sherwood said, if Judge Lake is to pass on the papers, and they go through all right, Ballou was to assume the mortgage; then witness went down to the bank and gave Sherwood the money. This evidence was introduced on the part of the defendant, appellee.

The sole object of the introduction of the clause of the

petition referred to was to lay the foundation for the introduction of the proof of the payment by the appellants to the appellee of the $25,000 upon the contract according to one of the terms thereof. If the theory of the appellants' case is correct, they are entitled to a conveyance of the property which, by the terms of the contract, they contend was agreed to be conveyed to them by Sherwood, only as burdened with the incumbrance of $25,000, loaned and advanced on the property by Creighton, and actually delivered over to Sherwood. It is to that extent only a variation of the contract; not so much in the method as in the proof of payment; and that proof having been offered and given by the appellee himself, and not appearing to be in violation of any rule of evidence, or of equity, I think it fully sustains that allegation of the appellants. It is no variation of the written contract; neither does the evidence of payment, had it been introduced by the appellants, tend even to establish the contract by parol, but only to prove the performance of certain conditions of the contract, agreed to be performed by the appellants—the cash payment of the consideration.

II. The second objection is that the contract set up is too indefinite to be enforced unless made definite and certain by parol, which, under the rule, is not permissible. The objection is taken more especially to that part of the contract which designates "twenty acres adjoining Cote Brilliante"; that the description of that tract is not such as to enable the court, without parol evidence, to apply it to the premises agreed to be conveyed. By reading the contract it is seen that the first property designated is that of "E. H. Sherwood's barn and lot, Seventeenth and Davenport"; undoubtedly meaning that the property to be exchanged and conveyed by Sherwood is his barn and lot on the corner of Seventeenth and Davenport streets, and this appears, from the whole case, to have been the sole property intended to have been exchanged by him.

Following this is a description of real estate, cash, and trust company stock to be exchanged by O. H. and E. G. Ballou therefor. "Ballou's lot 2, B. 174, with price, less the incumbrance, and the net price." The "east half lots 5 and 6, B. 80, Omaha, with price, less the incumbrance, and the net price." The "twenty acres adjoining Cote Brilliante, Douglas county, with price." The "north half block 1, Ambler Place, with price." The "lots 14, B. 5, and 11, B. 2, Boggs and Hill's addition to Omaha, with price, less the incumbrance, and the net price." In these descriptions the owner's, Ballou's, name, in the possessive, only occurs once, but that immediately precedes the first description, and must be taken to be the case of that which follows, and not limited to the one instance, but in the third description of property to be exchanged should be held to read "Ballou's twenty acres adjoining Cote Brilliante, in Douglas county," and so also as to the second, fourth, and fifth designations of property exchanged under the contract. Yet as thus read, and understood, it may be contended that the several subject-matters of the contract are in some degree subject to be ascertained by extrinsic evidence. That this may be done was held by this court in the case of *Adams v. Thompson et al.*, 28 Neb., 54, in which the contract for the sale of the real property was entered into by the parties through correspondence by mail, describing the property in the first letter of the plaintiff to the defendant, as follows:

"Omaha, Neb., Oct. 26, 1885.

"Dear Sir: Mr. Pollock, signal service officer, informs me that you own lot in McShane's sub. Do you wish to dispose of your contract upon reasonable terms?"

' In several of the subsequent letters the negotiation was mentioned, but always by the same description—"five d., McShane's sub."

In the opinion of the court, by the then Chief Justice Reese, the following language was used:

"But it is contended by appellant that there is no such description of the real estate in the correspondence as would entitle the purchaser to a decree for specific performance. The first letter from plaintiff to defendant refers to defendant's lot in McShane's sub. (meaning subdivision). In the answer defendant refers to 'the' five acre lot in the same subdivision. The same occurs in defendant's letters of November 6 and 11, and throughout the whole of the correspondence there is no question as to the identity of the property. Defendant had no other property in the subdivision referred to, and the correspondence was with reference to that owned by him. This was sufficient to admit parol evidence as to the description." Upon this question the chief justice cited *Atwood v. Cobb*, 16 Pick. [Mass.], 230, an action to recover damages for the non-performance of an agreement to convey real estate under the following contract signed by both parties:

"MIDDLEBOROUGH, March 25, 1883.

"This certifies that I have sold to Nathaniel Atwood about five acres of land, more or less, with the shop and other erections and improvements on it, which I own in Middleborough, on the road to Wareham, being the same which I bought of him, in consideration of the same sum which I paid him for the same, with interest from the time I purchased the same till I paid for it (supposed about six months) with the expense of the deed; also the taxes for one year."

At the trial a nonsuit was ordered, and upon exceptions taken to the supreme court the nonsuit was vacated. Chief Justice Shaw, after sustaining the trial court in overruling certain parol evidence offered, said: "But parol evidence of the situation and circumstances of the land, or other subject-matter about which the contract treats, is admissible to explain and give effect to the terms of the contract."

Also the case of *Hurley et al. v. Brown*, 98 Mass., 545, to enforce the specific performance of the following contract:

" $50.                                    Lynn, April 14, 1886.

"Received of John and Michael Hurley the sum of fifty dollars in part payment for house and lot of land situated on Amity street, Lynn, Mass. The full amount is $1,700. This bargain to be closed inside of ten days from date thereof."

At the trial the plaintiffs proved by parol (subject to objections to the admissibility of the evidence) that the defendants owned no other real estate on Amity street, and that the parties had been in treaty for the purchase of the premises described. Hoar, J., found as a fact that the piece of real estate mentioned in the receipt was that described in the bill, but it appeared in evidence that there were other houses situate on lots in Amity street. The case was reported for the determination of the full court. In the opinion by Foster, J., it was held that "No more particular description is necessary under the statute of frauds in a contract for the sale of real estate than is one relating to personal property. In each, to constitute a bargain and sale, or a contract which will be specifically enforced in equity, the subject-matter thereof must be identified. In a deed, the words of description are, of course, intended to relate to an estate owned by the grantor. This is also the presumption in construing a contract for a future conveyance. If the party who enters into the agreement in fact owns a parcel answering to the description, and only one such, that must be regarded as the one to which the description refers. With the aid of this presumption, the words " *a* house and lot " on a street where the party who uses the words owns only one estate, are as definite and precise as the words " *my* house and lot " would be; a description the sufficiency of which has been placed beyond all doubt by very numerous authorities. (*Bird v. Richardson*, 8 Pick., 252; *Phelps*

*v. Sheldon,* 13 Id., 50; *Atwood v. Cobb,* 16 Id., 227.)  In both cases the same extrinsic evidence must be resorted to, by the aid of which all uncertainity is removed. Where the words used are "*my* estate," in a particular locality, oral evidence is necessary to show what estate the vendor did own."

And also the case of *Sanborn et al. v. Nockin,* 20 Minn., 178, for the specific performance of a contract to convey real estate through correspondence by letter based upon the following description of property by one of the plaintiffs to the defendant:

"APRIL 27, 1872.

"I learn you are the owner of five acres of land in section 2, T. 28, R. 23.   *   *   *   If you desire to sell I would like to learn your terms, and will make you an offer, if desired."

In the opinion of the court it was held that "the evidence showed that the defendant was the owner of five acres of land in section 2 aforesaid, being the same particularly described in the complaint, and that his title thereto was perfect of record, and there was no evidence tending to show that he was the owner of any other land in said section.   This was certainly a sufficient ascertainment and identification of the land referred to in the contract."

In support of the principle held, in the cases mentioned, is cited that of the English decision, in 1817, of *Ogilvie v. Foljambe,* 3 Merivale's Reports, p. 60, on an agreement to purchase a leasehold house in Grosvenor Place, by the defendant, which having been violated, the master of the rolls said : "The subject matter of the agreement is left to be ascertained by extrinsic evidence, and for that purpose such evidence may be received.   The defendant speaks of 'Mr. Ogilvie's house,' and agrees 'to give £14,000 for the premises;' and parol evidence has always been admitted, in such a case, to show to what house, and to what premises, the treaty related."

In the case of *Adams v. Thompson*, cited as a decision of this court, it will be observed that the opinion was that of a divided court, one member dissenting, but in the dissenting opinion, while adequate reasons were given, on grounds fully expressed, there is no dissent to the admission of parol evidence in support of the contract.

Within the rule of the cases cited there was evidence introduced upon the trial, and admitted subject to exception, tending to identify, and in my opinion does, in the absence of any conflicting evidence, sufficiently identify the several parcels of the appellant's property described in the contract with that set out, and technically and particularly described in the petition.   And also to identify the several parcels of land described in the contract with the lands contemplated and intended by the parties in the negotiations which led up to the execution of the contract.   By such evidence it was proved that lot 2, block 174, was situate on Jackson street, Omaha, in Douglas county, with improvements of two houses and a barn ; that the plaintiffs were in possession at the time of the exchange, and owned no other property in that block or vicinity ; that in the negotiations for the exchange the appellee contended, for a time, that the valuation in the exchange was too high. Also that the east half of lots 5 and 6, block 80, Omaha, were situate on Capitol avenue, between Nineteenth and Twentieth streets ; that the property was improved by a two-story frame house and barn ; that plaintiffs were in possession, and owned no other property in that block or in that vicinity.   Also that there was, and still is, a well known addition to the city of Omaha laid out and platted into lots, in the market and on the records, as Cote Brilliante; that the twenty acres described by metes and bounds in the petition, owned by the plaintiffs, adjoins said addition known as Cote Brilliante, improved with a dwelling house, and under partial cultivation, with fruit and vines, was in the possession of plaintiffs at the date of the

contract for exchange of property, and was the only land or lots owned by them adjoining said addition, or in that vicinity. Also, that the property described in the petition as the north half of block 1, Ambler Place, an addition in Douglas county within the limits of Omaha, is by such evidence fully identified with the parcel of real property described in the contract as [Ballou's] N. half B. 1, Ambler Place.

It is deemed scarcely necessary to contend that in describing town lots the capital initial letter N. is universally understood in this state to mean north, and the letter B. to mean the block on which the lot is situate.

It was also in like manner proved on the trial that Ambler Place was at the time an addition to the city of Omaha, located in section 29, in the southwest part of the city; that it was well known city property, that had been platted into blocks and lots, many of which had been sold, resold, and improved, and that the plaintiffs owned the half block described in the petition as in Ambler Place, at the time of this exchange, unimproved.

By the same evidence the property set out in the petition as lot 14 in block 5, and lot 11 in block 2, in Boggs and Hill's second addition to the city of Omaha, was identified with that described in the contract as lot 14, B. 5, and lot 11, block 2, in Boggs and Hill's addition, Omaha. It was proved that Boggs and Hill were the proprietors of two additions to the city of Omaha, one of which was known as Boggs and Hill's addition, the other as Boggs and Hill's second addition; that the plaintiffs neither owned nor claimed any property in the addition, but did own and had possession of the lots described in the second addition. The location of the lots on Twenty-ninth avenue, on which they are described as fronting, is sufficiently set out in the evidence.

It was also proved that the failure to insert the word "second" in the description of the property in the con-

tract was by inadvertence and was not by design; and there is no suggestion that the property as correctly described in the petition was not fully understood to be the same as that intended to be described in the contract.

III. The third point arises upon the question of title. In this I refer to Exhibit B, set forth, the last clause of which is that "all titles to be perfected, abstracts to be furnished on both sides." The two exhibits being parts of the same transaction, and executed at the same time, for a common purpose, must be construed together and relatively to each other. The quoted words of the receipt, therefore, amounted to a notice from one party to the other that there existed something about the title of some part of the prop-erty being exchanged that required perfecting. This is the only evidence apparent, upon the record, that either party were, at that time, aware of there being an action pending involving the title to part of the real property being exchanged.

It appears by the records of this court, of which the court will take judicial notice, that on the 4th day of October, 1887, one Frances Walton commenced an action against one Henry Ambler and others in the district court of Douglas county, including one of the plaintiffs in this action, in which she set up and claimed to be the owner of an undivided one-sixth interest in the tract of land therein described, and which includes the north half of block 1, Ambler Place, an addition in Douglas county, Nebraska, and within the limits of the city of Omaha, as described in the amended petition, which interest she claimed as one of the legatees under the will of her father, Daniel Phillips, deceased; and the prayer of the petition, in which case, was a partition and sale of the said land.

It also appears that on the same day the said plaintiff, Frances Walton, commenced an action in the same court against one Leopold Doll, which action involved some portions of the same property of the case hereinbefore

mentioned; that issue was joined in both of said causes, which were, both upon the same evidence, tried to the said court together on the 7th day of January, 1889; that in each case there was final judgment on the merits for the defendants; and that each of said causes were brought to this court upon appellate proceedings, where, upon full consideration, both of said judgments were affirmed. (See 29 Neb., 626.)

The above is, no doubt, the lawsuit or lawsuits which Mr. Sherwood heard about when he went to the bank shortly after signing the contract, and which caused him to become dissatisfied with the trade.  But he nevertheless afterward met Ballou and Creighton at the Paxton hotel, as we have seen, and while he, as he testified, expressed anxiety on account of the lawsuit, he expressed no determination to abandon or repudiate the contract, but, as we have seen, recognized Ballou as the active and interested party in closing up the loan of $25,000 upon the property at Seventeenth and Davenport streets, with Creighton.  Yet Mr. Sherman testified that when he heard of the lawsuit he told Hartman that he did not care to have anything more to do with it, adding, "I was, of course, frightened about it some—never heard of it before."  He again fixes the time, definitely, as Monday, December 12, in the forenoon, when he had the conversation with Hartman, and that his cause and ground of dissatisfaction with the trade was the lawsuit and the effect of the lawsuit upon the title. And he speaks of the lawsuit as "the Ambler lawsuit."

There was an interview between O. H. Ballou and Mr. Sherwood at Higgins' restaurant on or about the 15th day of December, or between that day and the 20th December, 1887, at which time it appears that Ballou had obtained a quitclaim deed of the Ambler Place property from the plaintiff in the said lawsuit for a consideration of $1,200, and tendered it, together with the deeds for the property nd the Midland Guaranty and Trust Company stock, as

Ballou v. Sherwood.

stated in the contract, to Sherwood. At this interview, as he testifies, Ballou laid the papers down on the table " and remarked 'these are the deeds,' " etc. "And I said, ' Mr. Ballou, that trade has been declared off some time ago, and I want nothing to do with it.' And I said, 'I am not satisfied with the trade.'" "Well," says he (meaning Ballou), "here is a quitclaim deed of the lawsuit." "Well," says I (meaning Sherwood), "there are other defects, and I don't want anything more to do with it." All that Mr. Sherwood appears to have said to Ballou at that, or any other time, in response to his tender of the title papers and the stock, was to refer him to what he had previously stated to Hartman in regard to the lawsuit and that the trade was off.

Considering the whole of Mr. Sherwood's testimony it appears that he determined to break off the trade and to refuse to carry out the exchange of property solely upon the ground, and for the reason, of the Ambler lawsuit; and that he declared the intention to Hartman, whom he says he understood to be acting for the Ballous in the business. He states expressly that he told Ballou that he "had told Hartman a week ago that I had declared the whole thing off. I told Hartman, virtually, when he referred to the lawsuit, that I didn't want to have anything more to do with it." In another place he states that he made this statement to Hartman on the 12th, and he also states, that Judge Lake returned from Peoria on the 19th, so that it is apparent that his refusal to carry out the trade and exchange of property was based upon some reason other than the want of a seal to the deed from Crawford to Richardson and Moore, as it runs through the entire case that that defect was first discovered and communicated to Sherwood by Judge Lake after his return from Illinois.

While it is not denied that before Sherwood will be compelled to accept a deed of Ballou's property in exchange for his own he must be presented with a merchantable title.

I do not think that the existence of a lawsuit involving the title to a piece of real property would be received as evidence in any court that the title thereto, in any party to such suit, or other person, was unmerchantable. It is the title itself, in fact and in law, that must govern the question of its quality. In the two lawsuits above referred to, wherein the title to the Ambler Place property of the Ballous was litigated, other property depending upon the same questions of law and fact was also involved. Before the same were or could be brought to trial, the Ballous, for a large and valuable consideration and outlay of money, obtained a conveyance of all title claimed by the adverse litigants (as to their property) and tendered it to Sherwood, yet, nevertheless, there being other parties than the Ballous owning and claiming other property involving the same law and facts, as we have seen, the said lawsuits were brought to trial in the one court and to review in the other, and in both cases were decided upon the merits against the litigants adverse to the Ballous.

Sherwood, having refused to carry out the contract and exchange of property, basing his refusal solely upon the existence of a lawsuit involving the title to a part of Ballou's property, cannot be permitted, after driving his opponent to litigation, to enforce the contract, to change his ground and defend his refusal upon another and different ground. This point was decided by the supreme court of the United States in the case of *Railway Company v. McCarthy*, 96 U. S., 258. To state the point briefly as it arose in that case, there was a contract to ship a quantity of cattle from East St. Louis to Philadelphia. The cause of action was negligence, carelessness, and delay on the part of the railway company in the shipment of the cattle. It appears that the cattle arrived at Parkersburgh, West Virginia, Saturday night or Sunday morning, when there was delay, as defendant claimed, by reason of its being impossible to procure cars in which to continue the shipment of the cattle. Upon the trial the

defendant requested the court to instruct the jury, amongst other things, "that it was not the duty of the defendant or its connecting line, the Baltimore & Ohio Railroad Company, to start out from Parkersburgh on Sunday with the plaintiff's cattle, and that the plaintiff cannot recover damages for failure to do so," which was refused. Upon error the supreme court in the opinion say: "We have already shown that the defendant proved upon the trial that it was impossible to forward the cattle on Sunday for want of cars, and it is fairly to be presumed that no other reason was given for the refusal at that time. It does not appear that anything was then said as to the illegality of such a shipment on the Sabbath. This point was an afterthought suggested by the pressure and exigencies of the case.

"Where a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and different consideration. He is not permitted thus to mend his hold. He is estopped from doing it by a settled principle of law;" citing *Gould v. Banks*, 8 Wend. [N. Y.], 562; *Holbrook v. Wight*, 24 Id., 169; *Everett v. Saltus*, 15 Id., 474; *Wright v. Read*, 3 Durnf. & East [3 Term R. Eng.], 554; *Duffy v. O'Donovan*, 46 N. Y., 223, and *Winter v. Coit*, 7 Id., 288. These cases thoroughly sustain the principle to which they are cited.

But even if the defendant, appellee, after having refused to carry out his contract for the exchange of property, and basing his refusal solely on the ground that that portion of the property to be conveyed in exchange by the Ballous, situate in Ambler Place, was involved in the Ambler lawsuits, was afterwards permitted to shift his ground of refusal upon the alleged defect in the title to the land upon which the Ambler Place was laid out and platted in the proprietors' addition, and so in the Ballous, let us inquire whether that title is to be considered defective, and whether upon that ground the defense can be sustained.

It appears from the evidence that the land upon which
Ambler Place addition is laid out and platted, the west half
of the southeast quarter of section 29, township 15, R. 13 E.,
was entered at the United States land office, March 23, 1857,
by one Daniel W. Crawford, and that there is in fact recorded
upon the record of deeds of Douglas county a warranty
deed by Daniel Crawford to William E. Moore and Lyman
Richardson dated and filed for record March 26, 1857,
conveying the same tract of land for an alleged considera-
tion of $1,850, for the same and other lands.    It also ap-
pears that said deed was executed by said Crawford before
one Jonas Seeley, describing himself and signing his name
officially as a notary public, of Douglas county, Nebraska
territory, without affixing, and without claiming to use a
notarial seal.    It is upon this alleged defect in the notary's
acknowledgment of the deed that the defendant, appellee,
seeks to question the title of the Ballous in the Ambler
Place property.    Upon the trial the plaintiffs introduced
the testimony of Lyman Richardson, a witness, who testi-
fied that he first came to Omaha to live in January, 1855,
and had lived there since, except for five or six years dur-
ing the war and subsequently; that he knew the property
called Ambler Place; that formerly in partnership with
William E. Moore he owned it; that they purchased it
from D. W. Crawford, and together received a deed from
Crawford, which deed was for a time in witness's possession,
but was not now to be found, as he had made diligent
search for it; that he knew D. W. Crawford for six months
or a year covering the time of the transaction of the pur-
chase of the land and the deed from him; that witness and
Moore at the time specified bought of Crawford land em-
bracing 120 acres, including the Ambler Place property;
that he thinks Crawford had a fee title to the land con-
veyed to Moore and witness, situated in section 29, town-
ship 15, range 13, which witness cannot more particularly
describe from memory, it being the same which Moore

and witness mortgaged back to Crawford, and finally wit-
ness's half of it to S. A. Megath. Witness does not know
what became of Crawford after the sale of the land; he
thinks he was here afterwards, but has not seen him for
thirty years and thinks he was an unmarried man at that
time, from twenty-three to twenty-five years of age.

Cyrus Morton, a witness for the plaintiffs, being sworn,
testified that he resided in the same township west of
Omaha in 1856 as at present, had resided there perma-
nently for the last fourteen years, but off and on for thirty-
two or thirty-three years; first came to Douglas county in
1856; knew Daniel W. Crawford in the summer and fall
of that year; both he and witness had a pre-emption claim
adjoining east and west; proved up their claims about the
same time, and were witnesses testifying for each other;
thinks Crawford proved up on 160 acres, and that Ambler
Place is now a part of that land; block 1 of Ambler Place
is a portion of that land. To the best of witness's knowl-
edge, Crawford was a single man at that time in March,
1857, and for several years afterwards; witness was well
acquainted with him. From the date of entry of the tract,
for several years, then, witness knew but little about its
possession; since 1875 witness knew about it; the com-
mon report was that Captain Moore and Lyman Richardson
bought the land; witness does not think they occupied it,
but that it was used for pasturage, and some hay was cut
by different persons. Witness first occupied it in 1875,
through Mr. Ambler, or his local agent, Reuben Allen,
who represented Ambler. Witness's possession consisted
in cutting hay on the land from 1875 to 1885, also in plow-
ing a strip around it of not less than a rod and from that
to a rod and a half in width, and about an half an acre out-
side the strip to show possession and keep off herds; the
strip was put in corn and Hungarian grass and the half
acre in potatoes; witness gave up possession about three
years before the date of trial, when the land was laid out

in lots as Ambler Place, since which he has had nothing to do with it; but a number of families live on it, and houses were built two or three years ago, and are generally occupied. Witness last saw Crawford in the winter of 1868 or '9, or 1870, then living at Council Bluffs and married to a widow Viers; visited him at his house there and thinks it was in December, 1868, or the following winter; fixes the time from the fact that he returned from Montana in November, 1868, and it was after his return that he visited Crawford. Had seen Crawford the last, prior to that, two years before, in Montana, and he was then unmarried; cannot answer when he was married, but prior to the time witness saw him in Council Bluffs; saw his wife for the first time then, but had known of her; she was an elderly person, had borne children by her first husband, but not any to Crawford that witness knew of; cannot give the date of Crawford's death, but it was about seven or eight years before this trial, and witness was sent for to attend the funeral at Council Bluffs, but never saw him after the visit mentioned.

Upon cross-examination the witness stated that he had no absolute knowledge that Crawford might not have been married prior to his marriage to Mrs. Viers, but had always known him as a single man.

From this evidence it appears that actual adverse possession of the land in controversy on the part of Henry Ambler, through the witness Morton, commenced in the year 1875 and continued to 1885, when the same was laid off into lots, blocks, and streets as an addition to the city of Omaha, and a portion of the lots have since been occupied in severalty by purchasers and builders thereon, all claiming through Mr. Ambler. I think it is thus satisfactorily proven that the statute of limitation had fully run as to the title to the land against Daniel W. Crawford and his legal representatives. I need not refer to the many cases in which it has been held in this and other courts that ten

years' open, notorious, adverse possession of real estate gives a perfect title to the adverse possessor, and this without regard to color of title or presumption of a paper title. But were this not the case, we have here both color of title and a perfect paper title, with one technical omission—that of the claim of the notary Seeley to the use of a notarial seal. But it is suggested in the brief of counsel that it does not appear that the marriage of Crawford, late in life as it was, did not result in children, and counsel add, presuming that it did, it leaves to-day outstanding heirs, against which the statute does not run, who may still claim ownership of this property. The position of counsel must be upon the mistaken idea that the statute of limitation having began to run during the lifetime of Crawford would stop, go back, and commence anew, as against any minor children surviving him. That such is not the law of this state I need only refer to the case of *Hardy v. Riddle*, 24 Neb., 670, an ejectment for real estate, in which it was held, in the opinion by Chief Justice Reese, that "It seems to be conceded that if the possession of Cameron and his grantees was adverse to the plaintiffs, the statute began to run against Thomas Hardy in his lifetime; but it is contended by the plaintiffs that his death and the minority of plaintiffs arrested the running of the statute until their majority, and therefore their action is not barred. It is true that some authorities are found which sustain the theory contended for, but the great majority of the American decisions we think are the other way, and it seems to us to be the settled law of this country that when the statute begins to run as against the father his death and the minority of his children or other heirs will not arrest it, and if it has run the statutory period before the commencement of the action, the bar is as complete as though he had lived through the whole of the time of the statutory period of limitations." To this was cited the decisions in *Tyler v. Tyler*, 2 S. W. Rep. [Ark.],

466; *De Mill v. Moffatt*, 13 N. W. Rep. [Mich.], 387; *Rich-ards v. Clark*, 3 Green [N. J.], 327.

As to the general proposition that continuous, open, no-torious, adverse possession of land for the term of ten years in this state gives the possessor a perfect title, sufficient for the purpose of enforcing the specific performance of a con-tract for its sale and conveyance, I think there can be no doubt. Willard, in his treatise on Equity Jurisprudence, at star page 295, says: " Equity never compels a vendee to accept the conveyance of a doubtful title. If there be a defect in the paper title of the vendor it seems that if his possession under color of title has been sufficient to estab-lish a good adverse possession it is sufficient to be ·the ground of a decree." This text has been followed in in-numerable cases, many of which are cited by counsel for appellants: *Hellreigel v. Manning*, 97 N. Y., 56; *Murray v. Harway*, 56 Id., 337; *Brown v. Witten*, 19 O., 143; *Thacker v. Booth*, 6 S. W. Rep. [Ky.], 460; *Shober v. Dulton*, 6 Phil. [Pa.], 185; *Pratt v. Eby*, 67 Pa. St., 396; *Godden v. Kimmell*, 99 U. S. 201; *U. P. R. R. Co. v. McAlpine*, 129 Id., 314; *Railway Co. v. McCarthy*, 96 Id., 258; *Carson v. Ins. Co.*, 62 Ia., 433; *O'Connor v. Huggins*, N. Y. Supp., vol. 1, 377; *Jennings v. Reevis*, 7 S. E. Rep. [N. Car.], 897; *Garner v. Lasker*, 9 S. W. Rep. [Tex.], 332.

It will be observed that most of these cases are from the older states where the statutes require a much longer time to run than in this state, some of them twenty and others thirty years, so that in nearly every case the statute had run twenty, thirty, or forty years; but the principle of the decision is the same, that where an adverse possession had ripened into a perfect title it was held to be good in cases of specific performance and kindred cases.

In the present action it should have been stated in the proper place that according to the abstract of title, taking it up again, Lyman Richardson and William E. Moore conveyed the land in question to Daniel Phillips, who

is deceased, and who before his death disposed of it by his last will and testament to certain heirs therein named, together with other property in the state of Iowa, and that the heirs conveyed the land to Henry Ambler, under whom it was occupied by Cyrus Morton up to the year 1885, and since then by various persons grantees of Ambler. So we see that the land was not only in the adverse possession of the grantors of the plaintiffs for the full term of ten years, but was also so possessed under color of title, which, though perhaps not strictly important in this state, is mentioned as bringing the case altogether within the authority of the text-book and the examples cited.

As to the equities of the case, there is nothing in the evidence even tending to show that the contract was a hard or unequal bargain on the part of Sherwood; or that it is surrounded with any circumstances or flavor of injustice or lack of equity. We are favored with not the slightest key to the meaning of the words in the counsel's brief which imports this to be "a case, in fact, in which the infirmity of body and condition of the vendor is taken advantage of by systematic combination between the appellants and certain alleged agents to draw the appellee into an unrighteous, unjust, and inequitable contract."

There is no evidence, aside from that furnished by the contract itself, of the relative value of the property bought in the sale and exchange by Ballous, and that by Sherwood.

It is true there is the testimony of the counsel who examined the title, that it would not be possible to borrow money from any of the loan agencies upon one of the parcels of Ballous' property, but there is also the testimony of the appellee himself that he found it impossible to borrow money from the loan agencies on his property for the reason that it was perishable property and not acceptable on that account.

Upon the whole case I am of the opinion that it was not only a legal, but a just and equitable contract for the

exchange of property, and that the defendant having for no good reason refused to execute the contract, it will be enforced in equity. The decree of the district court is therefore reversed, and a decree will be entered in this court in strict accordance with the prayer of the amended and supplemental petition of the appellants.

NORVAL, J., concurs.

MAXWELL, J., dissenting.

This action was brought by the plaintiffs against the defendant in the district court of Douglas county, and on the trial of the cause the court found the issues in favor of the defendant and dismissed the action, from which the plaintiffs appeal to this court.

The action is founded upon the following memorandum, marked "Exhibit A" in the record:

"OMAHA, NEB., Dec. 10, 1889.

"Memorandum of exchange of real estate and personal property between E. H. Sherwood and O. H. and E. G. Ballou.

| | | |
|---|---:|---:|
| E. H. Sherwood's barn and lot, 17th St. and Davenport | $115,000 | 00 |
| Ballou's lot 2, B. 174, $40,000, less $14,500 | $25,500 | 00 |
| E. ½ lot 5, 7, 6, B. 80, Omaha, $20,000, less $5,600 | 14,400 | 00 |
| 20 acres adjoining Cote Brilliante, Douglas county | 12,000 | 00 |
| N. ½, B. 1, Ambler Place | 20,000 | 00 |
| Lot 14, B. 5, 7, lot 11, B. 2, Boggs & Hill's Add., Omaha, $17,100, less $2,100 | 15,000 | 00 |
| Cash | 25,000 | 00 |
| Balance in Midland Gy. Trust Co. stock at 50c | 2,900 | 00 |
| | $115,000 | 00 |

"(Signed)                    E. H. SHERWOOD.
                              "O. H. BALLOU."

At the same time the defendant executed a receipt in favor of the Ballous as follows:

"Received of O. H. and E. G. Ballou two thousand dollars as part payment purchase money on lot four, and west third of lot three, block seventy-seven, Omaha, Douglas county, Nebraska, in accordance with a certain memorandum of sale and exchange of properties this day made between the said Ballous and myself in hands of C. Hartman, all titles to be perfected, abstracts to be furnished by both sides.                    EDWIN H. SHERWOOD."

The money evidenced by this receipt has been repaid to the Ballous and accepted by them, and does not enter into this case.

At the time of the preparation of these papers there was an action pending which affected the title of the Ambler Place property. There was also a defect in the conveyance of the title of that property from the original grantor, neither of which facts were communicated by Mr. Ballou to Sherwood, as Mr. O. H. Ballou testifies. This, no doubt, explains the above receipt—"all titles to be perfected."

The first question presented is the sufficiency of the memorandum. It is well established that only the party to be charged need sign the memorandum, and it was so held in *Gartrell v. Stafford*, 12 Neb., 546, that only the vendor was required to sign the memorandum. The reason is that the person who sells the estate in effect states in writing the person to whom the sale was made, the estate sold, and the price. The vendee accepts such memorandum, and it becomes a binding contract upon both. In such case the vendee, upon tendering or paying the money, is entitled to a conveyance. This rule is subject to some exceptions which will be noticed presently. Where two persons own land together both must sign the memorandum, or at least it must be done in the names of both so as to be a binding contract, which may be enforced against both. The rule is that the contract at the time it was entered

into must have been in such form as to authorize either of the parties to enforce it against the other, otherwise there is no mutuality. (*Boucher v. Vanbuskirk*, 2 A. K. Marsh. [Ky.], 345; *Hutcheson v. McNutt*, 1 O., 14; *Ohio v. Baum*, 6 Id., 383; *Cabeen v. Gordon*, 1 Hill Ch. [S. Car.], 51; *McMurtrie v. Bennette*, Harr. Ch. [Mich.], 124; *Hawley v. Sheldon*, Id., 420; *Benedict v. Lynch*, 1 Johns. Ch. [N. Y.], 370; *German v. Machin*, 6 Paige Ch. [N. Y.], 288; *Beard v. Linthicum*, 1 Md. Ch., 345; *Bodine v. Glading*, 21 Pa. St., 50; *Jones v. Noble*, 3 Bush [Ky.], 694; *Rider v. Gray*, 10 Md., 282; *Reese v. Reese*, 41 Id., 554; *O'Brien v. Pentz*, 48 Id., 562; *Ewins v. Gordon*, 49 N. H., 444; *Richmond v. Dubuque, etc., R. Co.*, 33 Ia., 422; *Tarr v. Scott*, 4 Brews. [Pa.], 49; Waterman on Specific Performance, 260.)

If a party is not bound by the agreement himself he has no right to call upon a court of equity to enforce performance against the other party by offering in his petition to perform his part of the agreement.   As was said by one of the great chancellors, "this would not be equity that a party not bound by the agreement itself should be permitted at his option, and when he finds it to his advantage to do so, to compel the other party to perform, when, if the advantage were the other way, he could not himself be coerced to performance on his part." (1 Sch. & Lef. [Irish], 18; *Tucker v. Clark*, 2 Sandf. Ch. [N. Y.], 96; *Meason v. Kaine*, 63 Pa. St., 335; *Duvall v. Myers*, 2 Md. Ch., 401; Waterman on Specific Performance, 260.)

In *Luse v. Deitz*, 46 Ia., 205, where a husband entered into a contract for the sale of real estate belonging to his wife, it was held that he could not compel fulfillment on the part of the purchaser by afterwards tendering a deed executed by both husband and wife, there being no mutuality.   So, where land was owned by two persons and a contract of sale was executed by one of them as though he owned the entire interest, when in fact he did not, it was held that there was a want of mutuality and the court re-

fused to enforce the contract. (*Bronson v. Cahill*, 4 Mc-
Lean [U. S.], 19). Where A, without any authority from B,
signs an agreement for the sale of land as the agent of B
and C, it was held that although one of the vendors was
willing to convey, yet there was no mutuality, whether B had
any interest in the land or not. (*Snyder v. Neefus*, 53 Barb.
[N. Y.], 63; Waterman on Specific Performance, sec. 197.)

Many other cases to the same effect might be cited,
but the rule is general that a party to be charged, who has
neither signed a memorandum nor authorized the signing
of the same, cannot be bound.

The English statute of frauds required the instrument
to be signed. Under this statute and others where the
same language is used, it has been held that the place of
the signature is not material. All the cases, however, hold
that the name, besides being in the handwriting of the
person to be charged, must always be inserted in such a
manner as to show the intention of the party to make him-
self liable on the contract. (*Kronheim v. Johnson*, 7 Ch.
Div. [Eng.], 60; *Knight v. Crockford*, 1 Esp. [Eng.], 188;
*Ogilvie v. Foljambe*, 3 Meriv. [Eng.], 53; *Morrison v.
Turnour*, 18 Ves. [Eng.], 175; *Propert v. Parker*, 1 Russ.
& M. [Eng.], 625; *Western v. Russell*, 3 Ves. & B., 187;
*Penniman v. Hartshorn*, 13 Mass., 87; *Hawkins v. Chace*,
19 Pick. [Mass.], 502; *Yerby v. Grigsby*, 9 Leigh [Va.],
387; *Bleakley v. Smith*, 11 Sim. [Eng.], 150; *Holmes v.
Mackeral*, 3 C. B. [N. S.], 787; Brown on Statute of Frauds,
357.)

Our statute declares that "no estate or interest in the land
* * * shall hereafter be created, granted, assigned, or
surrendered or declared unless by act or operation of law
or by a deed or conveyance in writing *subscribed* by the
party creating, granting, assigning, surrendering or declar-
ing the same. It will be observed that our statute is dif-
ferent from the English statute of frauds, in that it requires
the memorandum to be subscribed. The original statute

in which the word "subscribed" is used appears to have been passed by New York, and the construction of that statute was before the supreme court of that state in *Davis v. Shields*, 26 Wend. [N. Y.], 341, where the subject is reviewed at length, and it was held to be imperative that the name be signed beneath. The decision was affirmed in *James v. Patten*, 6 N. Y., 9, and *De Beerski v. Paige*, 47 Barb. [N. Y.], 172. The language of the statute, so far as requiring the party to be charged to subscribe the memorandum, appears to have been adopted in Alabama Code of 1867, sec. 1862; California Code, sec. 1624; Michigan Compiled Laws 1871, ch. 166, sec. 8; Minnesota Statutes of 1873, vol. 1, pp. 691 692; secs. 6 and 12, New York Rev. Stats. [6th Ed.], vol. 3, pp. 141, 142; Oregon General Laws 1872, ch. 8, sec. 775; Wisconsin Statutes of 1871, vol. 2, ch. 106, sec. 8; Waterman on Specific Performance, 240, and cases cited.

Under a statute like our own not a single case has been cited showing that a memorandum will be sufficient unless subscribed by the party to be charged. The change in the language is significant, and it was the evident intention of the legislature to require a party who should make a memorandum of sale to do so over his own signature; but in the case at bar E. G. Ballou did not sign the memorandum or obligate himself in any manner. This being the case he was not bound by the memorandum and the contract could not be enforced against him. The insertion of his name at the top is simply descriptive of certain property which it was proposed to transfer to Sherwood, and even under the English statute of frauds would impose no liability upon Ballou whatever. There was no mutality, therefore, in the contract.

Second—The memorandum in question was placed in the hands of Hartman by Sherwood to be held by him as an escrow. Hartman appears to have been the agent of both parties. There was no intention, on the part of Sherwood at least, to have it take effect as a memorandum until

the title of the property was found to be in satisfactory condition. That such a delivery may be made to an agent for a special purpose is now well settled. (*Dietz v. Farish*, 53 How. Pr. [N. Y.], 217; *Ford v. James*, 2 Abb. Ct. of App. [N. Y.], 159; *Gilbert v. North, etc., Co.*, 23 Wend. [N. Y.], 43; *Cocks v. Barker*, 49 N. Y., 107; *Braman v. Bingham*, 26 Id., 483; *Worrall v. Munn*, 5 Id., 229; 6 Am. & Eng. Ency. of Law, 859.)

Soon after the execution of the memorandum Sherwood was informed that a lawsuit was pending against the Ambler Place property and that there was some difficulty about the title. He thereupon informed Hartman that he would not take the property. This information was communicated to Mr. Ballou, notwithstanding which he seems to have paid $1,200 to certain alleged heirs claiming an interest in the "Ambler" estate, and obtained a deed of that interest. On the 20th of December, 1887, he tendered a deed of the property in question and demanded a conveyance from Sherwood.

The testimony shows that prior to that time Sherwood had consulted an attorney as to the character of the title which he would receive and was advised by such attorney that the title which Ballou could convey to the Ambler property would be unsafe and unmarketable. As there is some attempt to cast reflections upon Sherwood's conduct in the premises it may be well to say that so far as we can observe he acted in the utmost good faith by employing an attorney noted alike for his integrity and ability. Had he been seeking opportunities to evade his duty in regard to this property, it is not very probable that he would have made such selection. As there is a defect in the record title of the Ambler Place property it was sought to prove title by adverse possession, and one Cyrus Morton was called for that purpose. He testified as follows:

A. The possession of the land since 1875 I know about.

Q. Go back of that a little and give, as far as you know, the character of the possession.

A. The common report was that Captain Moore and Mr. Richardson bought the land, but I don't think they occupied it while they owned it, it was used partly for pasture and some hay cut on it by Tom, Dick, and Harry.

Q. Who first did commence to occupy it as actual possessor?

A. I commenced to occupy it in 1875.

Q. Under what claim of possession?

A. Through Mr. Ambler, or his agent here, Mr. Reuben Allen.

Q. Who did Allen represent?

A. Henry Ambler.

Q. When did that begin?

A. In 1875.

Q. What did you do in the occupancy of that land, say when you first commenced and when you let it go?

A. I cut hay on it for several years.

Q. How many years?

A. From 1875 to 1885, I believe.

Q. What did you do, if anything, as to the cultivation of the ground?

A. I plowed a strip around it, and cultivated a little in one corner of it, probably a half acre outside of the strip.

Q. And how large a strip did you plow around?

A. Well, not less than a rod, and from that up to a rod and a half as it happened to vary.

Q. Do you mean continuously around the track?

A. Yes, sir.

Q. What was your object in plowing around it?

A. To show possession and keep off herds.

Q. Did you raise anything on the strip?

A. Yes, sir; I raised corn on it one year and Hungarian one year, and the piece on the corner I raised potatoes on.

Q. When did you let go the possession on it?

A. I believe it was about three years ago.

Q. Laid out as what?

A. As Ambler Place.

Q. Then you had nothing more to do with it?

A. No, sir.

Q. You are living there and have been these last few years, you say?

A. Yes, sir.

Q. What has been done since the platting there as to occupancy?

A. A number of families live on it and houses built on it.

Q. What lots?

A. House on block 2 and houses on blocks 3, 4, and 5, and I couldn't state all.

Q. Scattered over the addition?

A. Yes, sir.

Q. When were they built?

A. I think it is two years last fall; two or three years, I am not certain which.

Q. Are these houses occupied?

A. Generally.

The plaintiffs evidently attempted to prove constructive possession by bringing the case within the statute in regard to cultivated lands. Sec. 8, ch. 2, Compiled Statutes, provides "That cultivated lands, within the meaning of this act, shall include all forest trees, fruit trees, and hedge rows planted on said lands, also all lands surrounded by a plowed strip, not less than one rod in width, which strip shall be plowed at least *once a year*."

It will be observed that there was no attempt on the part of Mr. Morton to plow the strip every year in order to bring the lands within the designation of cultivated lands. He says, "I plowed a strip around it and cultivated a little in one corner of it; probably half an acre outside of the strip." He nowhere testifies that his possession was exclusive or uninterrupted, or that it continued for the period of ten years. All three of those proposi-

Ballou v. Sherwood.

tions must be proved to establish adverse possession. That was so held by this court in *Carroll v. Patrick,* 23 Neb., 835; *Gower v. Quinlan,* 40 Mich., 572; *Dunn v. Miller,* 75 Mo., 260; *Perkins v. Blood,* 36 Vt., 273.

The laying out of Ambler Place into lots and blocks would not aid the plaintiff, as the settlement seems to have been restricted to certain lots and blocks on which buildings had been erected. In this state of the title no capable lawyer would advise a client to invest therein, as the property would not be salable for anything like its value, and a loan could not be obtained upon it from any loaning company in the state. Every purchaser of land has a right to demand a title which shall protect him from anxiety, lest annoying, if not successful, suits be brought against him and probably take from him land in which money was invested. He should have a title that should enable him not only to hold his land but to hold it in peace, and if he wishes to sell it, to be reasonably sure that no flaw or doubt will come up to slur its marketable value. (*Dobbs v. Norcross,* 24 N. J. Eq., 327; *Kostenbader v. Spotts,* 80 Pa. St., 430.)

In a large number of cases it has been held that where the evidence of title was merely that of long possession the purchaser would not be compelled to accept the title. (*Cunningham v. Sharp,* 11 Humph. [Tenn.], 116; *Lewis v. Herndon,* 3 Litt. [Ky.], 358; *Wayne v. Lyon,* 67 Pa. St., 436; *Freetly v. Barnhart,* 51 Id., 279; *Speakman v. Forepaugh,* 44 Id., 363; *Butler v. O'Hear,* 1 Dessaus. Eq. [S. Car.], 382; *Linkons v. Cooper,* 2 W. Va., 67; *Thomson v. Dulles,* 5 Rich. Eq. [S. Car.], 370; *Littlefield v. Tinsley,* 26 Tex., 353; *Powell v. Conant,* 33 Mich., 396.) And even where the court may regard the title favorably, if it has been questioned by lawyers of ability whose opinion on the subject is entitled to respect, specific performance may be refused. (*Price v. Strange,* 6 Mad. [Eng.], 159, 164; *Pyrke v. Waddingham,* 10 Hare [Eng.], 1;

*Snyder v. Spaulding,* 57 Ill., 480; Waterman on Specific Performance, 413.)

It is evident from an examination of the record that the capable lawyer who appeared for the plaintiffs was somewhat taken by surprise on the trial at the condition of the record title to the Ambler Place property and sought to cure the defect as far as possible by proof of adverse possession. So far as the record discloses, no such claim of title had been made until the trial. Mr. Ballou certainly did not make it when he tendered a deed to Sherwood.

Third—The contract is too indefinite to be enforced. It fails to show in what city or county Sherwood's barn and lot are situated, also in what city lot 2 in block 174 is situated; also the twenty acres adjoining Cote Brilliante, and the north half of block 1, Ambler Place.

In *Hamilton · v. Harvey,* 121 Ill., 469, the court says: "It is essential that the description of the subject matter should be so definite that it may be known with certainty what the purchaser supposed he was contracting for and that the court may be able to ascertain."

In *Eggleston v. Wagner,* 46 Mich. 610, the court, in speaking of the degree of certainty required, says: "The terms may be abstract and of a general nature, but they must be sufficient to fit and comprehend the property which is the subject of the transaction; so that with the assistance of external evidence the description, without being contracted or added to, can be connected with and applied to the very property intended and to the exclusion of all other property." Many other cases to the same effect might be cited.

It appears that lots 14, block 5, and 11, block 2, Boggs & Hill's addition to Omaha, which is incumbered to the extent of $2,100 and valued at $17,100, is not in the addition named. To explain this discrepancy Mr. Ballou testifies that he wrote the memorandum while Mr. Sherwood read the list from a copy which he had furnished

him. This Sherwood denies. His testimony on that point is as follows:

Q. Will you state what the fact is, according to your recollection, in that particular?

A. My recollection is this: After we had talked over the matter in regard to prices, etc., Hartman says, "Well, we had better draw up the contract, hadn't we?" and Mr. Ballou says, "Yes, sir." I assented to it, and Mr. Ballou says, "You draw up the contract," and Mr. Hartman says, "No, you draw it up yourself," so Mr. Ballou sat down to the desk. Mr. Hartman sat up alongside of him, right facing his left shoulder, and he and Mr. Ballou drew up the contract, and I was further back in the room, standing further back.

Q. State then explicitly whether you read this memorandum.

A. Not at that time; not to him I didn't; no, sir; Mr. Ballou and Mr. Hartman drew up that contract.

Q. And made their own descriptions?

A. Yes, sir, and I took Mr. Ballou's chair and signed it.

Q. Well, now, Hartman was acting at that time as Ballou's agent?

A. Yes, sir; I didn't know Ballou at all in the transaction until that forenoon, until about half an hour before this transaction was closed.

We thus, on this point, have a direct conflict in the testimony, and the court below had the witnesses before it and in its finding virtually passed upon their credibility, and in the present state of the testimony that question cannot be reviewed.

The proof fails to show that Sherwood had any knowledge of the precise location of the lots, or that he had ever seen them. Such being the proof there is a mistake which cannot be corrected by parol evidence.

Sherwood also testified in respect to his reasons for declining to complete the contract as follows:

Q. When you met Ballou and Creighton at the Paxton house subsequently what had you learned at that time in respect to objections to the title, and what did you do or say at that time in respect to declaring this trade off?

A. Well, I didn't declare it off then, I said this—I went down to lunch after this, and after lunch I went into the Commercial National Bank and met some friends of mine there and told them about this trade, and they said "there is a big lawsuit on the Ambler Place, a $20,000 lawsuit on Ambler Place."

Q. State what you said about that, after you got back to the Paxton hotel, to Ballou.

A. I said, "Ballou, I understand there is a big lawsuit on Ambler Place, that won't do."

Q. What did he say?

A. I understood him to say, "Well, Judge Lake can pass on that," that is what I understood; that is all the conversation that passed between us, but I am quite positive that is the remark he made to me, and I made a memorandum of it afterwards.

Sherwood also testified that Judge Lake, after a careful examination of the title, advised him, "that there is a serious defect in this title." He also testifies that he communicated this matter to Hartman and informed him that Judge Lake said he wouldn't buy the property himself; he said that the Omaha Loan & Trust Company wouldn't loan money on the property, and he said if there is anybody on the property. I wouldn't have a title whereby I could eject them, and Hartman said, "I am sorry this thing aint a going through because I wanted to get some commission out of it."

Q. What did you say about the trade being off?

A. I said decidedly it is off; I said I don't want to do anything else in this matter, and Hartman said, "Well, I have great respect for Judge Lake's opinion," and he said, "I am going around to see Mr. Ballou and tell him I will not urge the matter any further."

This was before the tender of the deed.

Mr. Ballou in his re-examination does not deny the testimony of Sherwood. He testifies on that point as follows:

Q. When did you first hear Judge Lake's name mentioned, if at all, in the connection with these affairs, the examination of titles, and from whom?

A. I think it was Saturday night, the 10th, or the evening of the 10th, Hartman came over to our office and said there was several abstracts to be got out and wanted us to hurry them up and get them out, and I think I asked him, as we couldn't get them all out at one time, where we should send them; he said he didn't know, but he presumed to Lake, as Lake had examined some before for Mr. Sherwood, and on the next Monday morning, in the forenoon, my brother and I went over to Mr. Hartman's office; I wanted to see the contract at Hartman's, hadn't seen it before, and Mr. Hartman said, "Lake is going to examine those abstracts, and you send them up here as fast as you get them and I will send them down;" that would be the 12th Monday, that is, the forenoon.

Q. Did you hear anything said about it before that?

A. That Saturday night he presumed, but positively Monday.

Q. Did Hartman, at any time, for Mr. Sherwood, communicate to you any complaints of this title, other than you have stated?

A. No, sir. I asked him, Hartman, a couple of times, if there was any other defect that he claimed, and he said he couldn't find out if there was."

The parties, therefore, in effect, agreed that Judge Lake should examine and approve or disapprove the abstracts. This he did, holding the title insufficient. It is claimed that Sherwood should have stated the very objections upon which his refusal was based, and that no other objections could be considered; and in support of this proposition,

certain cases, not relating to specific performance, are cited. What he wanted, evidently, was the property he had contracted for conveyed by a good title, and no court would be justified in compelling a party to accept a questionable title against his protest.

The fact that no case relating to specific performance has been cited in favor of the proposition, shows that the rule has not been applied in that class of cases, and it should not be applied in this.

The case of *Gregory v. Littlejohn*, 25 Neb., 368, is very similar to this in many respects. In that case the memorandum was placed in the hands of a third party until the title and character of certain real estate which it was proposed to be exchanged could be examined. The proposed title and land did not prove satisfactory, whereupon the party refused to perform and this court refused to enforce the agreement.

It is evident that Sherwood's title to the property that he was owner of, is good and that it is productive property. He should not be compelled to accept a title which no member of this court, if in the practice, would advise a client was free from reasonable doubt. The plaintiffs have lost nothing, as they still have their property. Nor should the defendant be bound by a memorandum which was not equally binding on the adverse parties.

There are other reasons why the judgment should be affirmed, but those heretofore given are sufficient. The judgment is right and should be affirmed.

SUPPLEMENTAL opinion on motion for rehearing.

[FILED JANUARY 6, 1892.]

MAXWELL, J., dissenting.

I am unable to concur in the views of a majority of the court in overruling a motion for a rehearing, and I will

briefly state some of the reasons why a rehearing should be granted. It is assumed in the majority opinion that the case of *Gartrell v. Stafford*, 12 Neb., 545, is similar to this, and because it was held in that case that only the party to be charged need sign the memorandum, that, therefore, only one of the parties to be charged in this case, viz., Sherwood, need sign. There is no similarity between the cases, as will readily be seen from a mere statement of the facts.

At common law a parol contract for the sale of land was valid, and if fair in all respects would be enforced. The statute of Charles II required the party to be charged to sign a memorandum of the sale, in order to prevent fraud and perjury, which, so far as we can judge at this distance, were frequently resorted to to obtain lands and goods. Therefore, the statute changed the rule of evidence so the contract must be proved by a note or memorandum thereof. All the common law pleaders agree that the statute did not change the mode of pleading the contract by the plaintiff; that remains as before the statute. Nor is the right to sue for the consideration changed; that remains as before the passage of the act referred to. Therefore, where a party sells lands to another and gives him a memorandum of the sale duly signed, he may, as before the passage of the act, sue for and recover the consideration. That is the common law, and is in force in this state, and that is what is decided in *Gartrell v. Stafford*. In the case at bar, however, there purported to be an exchange of lands. In other words, Sherwood sold his lots to one of the Ballou Brothers, and he was to pay him in lots owned by himself and brother. The brother did not sign the memorandum, so that he is not bound, and the contract could not be enforced against him. He is a party to be charged and it is admitted that he is not liable on the contract. It is a fundamental rule in specific performance of contracts that the contract shall be mutual; that is, that both shall be bound

or neither will. This rule is universal, and there is no exception, so far as I am aware. No case has been cited certainly in the majority opinion. If the party seeking to enforce the contract is not himself liable thereon, and it could not be enforced against him, there is no reciprocity in allowing him to enforce it against the other party. (*Benedict v. Lynch*, 1 Johns. Ch. [N. Y.], 370; *German v. Machin*, 6 Paige Ch. [N. Y.], 288; *Woodward v. Harris*, 2 Barb. [N. Y.], 439; *Phillips v. Berger*, Id., 611.) The attorneys for the appellee have cited a number of authorities upon this point which are not noticed or attempted to be explained in the majority opinion. This, no doubt, was one of the grounds upon which the capable trial judge in the court below refused to enforce the alleged contract.

Second—The description of twenty acres adjoining Cote Brilliante is entirely too indefinite. No case has been cited, nor have I been able to find any, where such a general description, unaccompanied with any explanatory language, has been held sufficient. The description will apply to any twenty acres even if purchased after the signing of the memorandum, and no doubt was one of the reasons why the court below refused performance of the alleged contract.

Third—The alleged memorandum provided that *all titles should be perfected*. In other words, that each party should furnish a perfect title to the property he was going to convey, but on the trial the appellants did not introduce any title whatever to Ambler Place. It is true an attempt was made to prove title by adverse possession. The party to be affected by the decree was not before the court and would not be bound by its judgment, and is not before this court, and, therefore, the finding and judgment, if against him, is no protection to appellees and gives them no title whatever. Nor did the proof establish open, notorious, exclusive, adverse possession for ten years before the trial of the case, and the title thus proposed is not a

marketable one, nor one that any member of this court, if in the practice, would advise a client was sufficient. The appellee is entitled to a marketable title, and the want of one fully justified the trial court in refusing to enforce the alleged contract.

Fourth—The misdescription of the lots in Boggs & Hill's addition is also a fatal defect. We must remember that the lots in the second addition of Boggs & Hill are much less valuable than those in the first addition.

A mistake is conceded, the only dispute being as to how it occurred. Upon this point the testimony of the plaintiff (O. H. Ballou) and defendant are directly at variance, and it is evident that one of them is mistaken. There is no corroborating proof of either, and the finding of the trial court in favor of the appellee cannot be disturbed unless we overthrow all our rules in cases of conflicting evidence.

There are many other reasons why a rehearing should be granted. I believe the decision is wrong and cannot be sustained either on principle or authority. It is the duty of a court to state the law correctly, and every departure therefrom works injustice, not only to the parties immediately concerned, but to the entire state, and it is the duty of each member of the court to contend for what he believes to be right in the premises and state his reasons therefor. I therefore dissent from the order overruling the motion for a rehearing. It is proper to remark, also, that I think this is the first case decided by a divided court, during the nearly twenty years that I have been a member, where a motion for a rehearing has been denied, and under the circumstances it seems to me that a rehearing probably would result in what I conceive to be a correct decision.