Enterprise Company, Inc., a corporation, appellant, v. Nettleton Business College of Lincoln, Inc., a corporation, appellee.

181 N. W. 2d 846

Filed December 11, 1970. No. 37523.

Ginsburg, Rosenberg, Ginsburg & Krivosha and R. P. Cathcart, for appellant.

Nelson, Harding, Marchetti, Leonard & Tate and Richard H. Williams, for appellee.

Heard before White, C. J., Carter, Spencer, Boslaugh, Smith, McCown, and Newton, JJ.

Smith, J.

Enterprise Company, Inc., sought an accounting and damages from Nettleton Business College of Lincoln, Inc. The suit related to Nettleton's renting its students living quarters in two apartment buildings of Enterprise. We limit our opinion to three of the main claims against Nettleton. (1) As manager of the buildings, it failed to account for all rentals received; (2) it wrong-

fully refused to surrender possession of one building; and (3) it breached its duties to maintain the buildings and to collect from tenants or to pay Enterprise for tenant damage beyond ordinary wear and tear.

The district court allowed Enterprise (1) $550 for rents paid Nettleton by occupants of overcrowded units in the fall of 1967 and (2) $399.50 for items missing from apartment appliances. Enterprise appeals.

The buildings, known as 601 and 1801, were constructed in 1963. A unit of the 43 units in each building accommodated 4 tenants without overcrowding. The manager, H. A. Wolf Company, prior to August 1965, leased units in 1801 to Nettleton for occupancy by girls enrolled in the business college. Nettleton paid rent based on the number of girls occupying apartments and not on the number of apartments occupied by the girls.

In July 1965, the parties were negotiating a management agreement and an option to Nettleton to purchase both buildings. Meanwhile they orally agreed upon Nettleton assuming management on August 1 subject to full review of rental rates. Orville Kingery, president of Enterprise, which we treat as owners at all times for present purposes, authorized Nettleton to contact possible students and to set up occupancy schedules for the upcoming school year.

The parties agreed in a writing dated September 1, 1965, as follows. During the purchase option period of 2 years, Nettleton, as exclusive manager, was to try to "maintain an average occupancy . . . of at least 75%." It promised to submit monthly a "running computation" of total rentals received. Enterprise reserved an option to terminate the contract, should gross rentals received at any time be less than 75 percent of the gross receivable upon full occupancy. The reservation was subject to the "right" of Nettleton within 10 days to pay the difference in cash.

The agreement contained this provision: "2. During the term of the option period . . . (b) The schedule of

rentals shall be fixed by . . . (Enterprise); that is the amount to be received for each apartment unit for monthly occupancy, shall be . . . fixed by . . . (Enterprise) and . . . (Nettleton) shall adhere to said schedule of rentals." Under the paragraph Enterprise increased the monthly rental rate a unit from $134 to $146, effective May 31, 1966.

The agreement required Nettleton to collect rentals monthly in advance and to remit same less deductions for certain expenses of management. It then continued: ". . . expenses incurred in the employment of a house mother and alternative, and for telephone and for such furniture as . . . (Nettleton) may be willing to provide, shall not be . . . an expense of management and no deduction for such items shall be made by . . . (Nettleton) from the rental proceeds."

The application form for enrollment at Nettleton prior to June 1, 1966, stated: "Student rate at Nettleton Manor is $37.50 per 4 week month." A revised form set the rate at "$140.00 per quarter (12 weeks) (Effective June 1, 1966)." A student deposit of $50, a "reservation fee," was to be applied to the last rent due. Another student deposit of $5 to $7 was to secure Nettleton against key and breakage damage.

An illustration of the monthly account submitted by Nettleton to Enterprise related to transactions at 1801 during June 1966. Part one, headed "Collections . . ." was as follows:

| Apt. No. | Rent Due This Month | Loss by Vacancy | Amount Paid This Month | Unpaid Balance |
|---|---|---|---|---|
| B1 | 146.00 | $ 52.12 | $ 93.88 | 0.00 |
| . . . | . . . | . . . | . . . | . . . |
| 103 | 146.00 | 146.00 | 0.00 | 0.00 |
| 104 | 146.00 | 63.88 | 82.12 | 0.00 |
| . . . | . . . | . . . | . . . | . . . |
| (Totals) 43 apartments | $6,278 | $3,556.14 | $2,721.86 | 0.00 |

Part two, headed "RECAP OF RENTAL INCOME AND EXPENSES . . ." was as follows:

"Rental Income . . .      $2,721.86
Expenses:

. . .
Total Expenses         230.00

Total to be remitted . . .    2,491.86"

The account statements included the $50 deposit but not the key and breakage deposit which Nettleton returned to the student in almost every case. The statements set out a monthly rental charge of $134 until June 1966, and the increase to $146 effective that month. During the latter period the statements did not account for the quarterly collection of $140, or approximately $46.67 a month, a student, but only for $36.50 a month. The difference went to pay charges for a housemother, a proctor for each floor, telephone, and building furnishings. All apartment units were furnished by Nettleton. Wayne Kingery, vice president and secretary of Enterprise, recognized in the Nettleton statements calculations on a per capita basis. He vaguely testified to one or possibly two verbal protests, explaining: "But I did not believe that we would not be compensated further at a later date due to the wording of that contract." On November 22, 1967, Wayne Wiegert, president of Nettleton, wrote Enterprise that the rate had been $36.50 a girl, or $146 a unit occupied by four girls. Enterprise continued to accept statements on that basis without written protest, except reiteration of $146 per apartment unit, prior to commencement of this suit on December 6, 1967.

In July and August 1966, Nettleton had remitted not only the balances shown on the monthly statements but also $6,735.11 in order to preserve its option. On April 12, 1967, Enterprise notified Nettleton of a deficiency under the 75 percent occupancy clause: ". . . Should . . . (Nettleton) fail to make such payment ($5,009.34),

within 10 days, then . . . (Enterprise) shall have the option to declare this contract forthwith terminated." The payment was not made. On June 1, 1967, Enterprise accepted a surrender of 601 by Nettleton with the statement that the acceptance terminated all contracts relating to 601.

On October 17, 1967, Enterprise wrote Nettleton in regard to 1801: ". . . there is no written contract between your organization and our's covering the rental of these apartments. Therefore, . . . 30 day notice will suffice for either of us to terminate this arrangement." Enterprise, in a letter dated October 31, purported to terminate the month-to-month tenancy, effective November 30.

Nettleton's lawyers on November 8, 1967, wrote Enterprise: ". . . there is no written agreement governing the tenancy. . . . We have reviewed the Nebraska law . . . and find ample authority . . . which would categorize the occupancy . . . as a year-to-year lease. . . . our client . . . will not quit the premises until August 31, 1968, assuming proper notice is given . . . to terminate the year-to-year tenancy."

Enterprise replied on November 20, 1967: ". . . expressly denying that any such claim . . . is . . . valid, we do recognize that some time necessarily will be involved before this issue can be resolved completely. Therefore, you are advised that during the . . . time . . . you continue to exercise . . . management of . . . (1801), the rent per apartment . . . is hereby . . . fixed as $159.00 per apartment. During such time . . . you should remit to the undersigned on the basis of $159.00 per month per apartment."

Nettleton on November 22, 1967, in writing stated its claim to the year-to-year tenancy and to a rental basis of $36.50 a student. It retained possession until June 1, 1968, paying rentals accordingly. The parties tried this suit intermittently from April 18 to October 17, 1968. On the latter date Wiegert testified to meeting Enter-

prise representatives subsequent to the surrender of 601. The subject was 1801. ". . . it was just a verbal agreement that we would continue to occupy 1801 and . . . to pay rental the way we had paid it before. . . . except not deduct any expenses, and they would . . . take back . . . paying the bills . . . . Q- . . . you mean . . . on a per girl basis? A- Yes. . . . we would have it until August of 1968."

The written agreement of September 1965 was ambiguous. The interpretation given a contract by the parties themselves while engaged in performance of the contract is one of the best indications of their true intent. Baxter & Sons v. Sofio, 182 Neb. 599, 156 N. W. 2d 141 (1968). In view of the conduct of the parties the rental rate was based on the number of girls in the units and not on the number of units occupied.

Enterprise contends that Nettleton was accountable for the difference of $10.17 between the $46.67 collected and the $36.50 remitted. Enterprise ought to have anticipated that Nettleton would pass on to students the expenses for dormitory services and furnishings. The contract between the parties interposed no obstacle. Respecting the key and breakage deposit, Nettleton did not account other than by general testimony and offer of its records for inspection. Under the particular circumstances the accounting for that item was sufficient.

The purported increase of "rent" to $159 a month was not effective. Correspondence between the parties establishes that the provisions of the 1965 contract were no longer in force. No other reason could justify the $159 amount in view of Nettleton's protest. Where a landlord notifies his tenant for a fixed term that in case the latter holds over he must pay a specified increased rental, the tenant will become liable for such rental if he in fact holds over, and either remains silent with reference to the notification, or fails to express his nonassent to the increase. Heckman v. Walker, 167 Neb. 216, 92 N. W. 2d 548 (1958).

Enterprise argues that our conclusion violates this rule: Where a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and different consideration. He is not permitted thus to mend his hold. Ballou v. Sherwood, 32 Neb. 666, 49 N. W. 790, 50 N. W. 1131 (1891).

It is true that Nettleton's protest against the $159 amount lay side-by-side with its claim to a year-to-year tenancy. That position was also somewhat inconsistent with Wiegert's testimony to an agreement.

The principle prohibiting a party from mending his hold is ordinarily applicable only if some previous conduct on his part would render present assertion of the right unjust. See State ex rel. Traux v. Burrows, 136 Neb. 691, 287 N. W. 178 (1939). See, also, Bigelow on Estoppel (Carter, 6th Ed., Rev. 1913), p. 604; Bisphams Principles of Equity (8th Ed., 1909), p. 434. Nettleton's letter expressed no more than an opinion, and the limit of its effect would be to charge it with the reasonable value of occupation and use after November 1967. Cf. Hays v. Christiansen, 114 Neb. 764, 209 N. W. 609 (1926).

Wayne Kingery testified that the fair and reasonable value of occupation and use of an apartment unit after November 20, 1967, was $159. His testimony was not directly contradicted. In the absence of a change of conditions, however, the monthly rental is competent evidence of the reasonable value of the occupation and use of premises that the tenant held over his term. See Kendall v. Uland, 83 Neb. 527, 120 N. W. 152 (1909). In addition the district court heard evidence that the units needed redecoration. The amounts remitted by Nettleton were fair and reasonable.

The evidence pertaining to Enterprise's claims of improper maintenance and tenant damage beyond reasonable wear and tear was in sharp conflict. We approve

the district court's resolution of those issues because of its opportunity to observe the witnesses.

The judgment is affirmed.

AFFIRMED.