Robert L. Andersen, Appellee, v. Blondo Plaza, Inc.,
a Corporation, Appellant.

186 N. W. 2d 114

Filed April 16, 1971. No. 37652.

Gaines, Spittler, Neely, Otis & Moore and John P. Mullen, for appellant.

Abrahams, Kaslow & Cassman, for appellee.

Heard before White, C. J., Carter, Spencer, Boslaugh, Smith, McCown, and Newton, JJ.

Smith, J.

Plaintiff, tenant, recovered damages of $16,000 on a claim that defendant, owner-lessor of a shopping center, had breached a covenant against competition. The district court overruled defendant's motion for judgment notwithstanding the verdict and an alternative motion for a new trial. Defendant appeals. Assignments of error are related to interpretation of the agreement, nominal damages, and admissibility of evidence.

SUMMARY OF EVIDENCE

Plaintiff, a farmer with dairy cattle, began bottling dairy products and selling food in 1963. His first food

establishment at 3641 Q Street, Omaha, has been selling sandwiches, ice cream, and milk. In July 1965, he opened Andersen Dairy Drive-In at 9201 North 30th Street, without service to parked automobiles. It has been carrying a full line of food, doughnuts, dairy products, and ice cream.

Defendant had leased the shopping center to 30 tenants. A form lease of 8013 Blondo Street in the center was assigned to plaintiff by Clyde F. Marquardt, doing business as Bakers Dozen Donuts. The lease ran from July 1, 1966, to June 30, 1970. Marquardt had an option to extend it for a period not exceeding 5 years, but defendant reserved the right to terminate it on 6 months notice. The rent comprised a minimum plus other amounts that included 5 percent of annual gross receipts exceeding $45,000.

Paragraph 1 of the Marquardt lease contained approximately 2½ blank lines with ¼ inch between lines for insertions. In it Marquardt agreed to use the property for "retail bakery and donut shop and other specialty food items related to a snack bar." Elsewhere in the lease, use for an unspecified purpose was prohibited. Marquardt agreed to obey all ordinances and laws of city and state and to use none of the area as "non-selling space." Both parties agreed not to operate another similar store within 4,000 feet of the shopping center.

When Marquardt assigned the lease to plaintiff with defendant's consent, all parties modified paragraph 1 to read: ". . . Retail bakery and donut shop and other specialty food items related to a snack bar covered by the following permits: Bakery permit, Soft Drink, Ice Cream permit, Food and Drink permit, Egg permit and Restaurant permit."

Extrinsic evidence of the modification was in conflict. According to Bill Stuht, defendant's manager, Marquardt had been selling sandwiches either prewrapped or prepared on order. Stuht added the language to paragraph 1 of the lease at plaintiff's request only because plaintiff

said Marquardt's operation without restaurant and other permits was unlawful. Informed of plaintiff's desire to operate snack bar and bakery and to add dairy products, Stuht said a similar store would be a dairy store. He also said defendant would probably lease the vacant space next door, 8017 Blondo Street, for restaurant purposes. The latter property had been designed and used as a restaurant. The last tenant prior to a fire in 1967 sold pizza at sit-down counters. Plaintiff manifested no intention to open a restaurant.

According to plaintiff, Marquardt had sold no sandwiches. Plaintiff requested the modification. He informed Stuht he would sell "the complete sandwich line, hamburgers, french fries, fish, chicken dinners, shrimp, and scallops, and potatoes; also our dairy line . . . and ice cream." It would be a complete food line like that in his store on 30th Street. Plaintiff had learned that the vacant space had been a "pizza place." Neither he nor Stuht mentioned the possibility of a restaurant there in the future.

Andersen Dairy Foods and Bakery, the name of plaintiff's store at Blondo Plaza, had a counter, 20 seats, 3 tables, chairs and a drive-in without outside service. It was a fast foods or short order business which possessed restaurant and other permits. For sale were "broasted" chicken, hamburgers, cheeseburgers, tenderloin sandwiches, fish burgers, french fries, onion rings, and chili, plaintiff using disposable plates and cups. Business hours ran from 6:30 or 7 a.m. to 9:30 or 10 p.m., 7 days a week. One employee arrived at 3 a.m. to fry doughnuts for all the stores. Two employees served customers in the morning, one in the afternoon, two at the close of the school day, and one in the evening during bad weather. Plaintiff's wife worked there from time to time, training employees.

The space at 8017 Blondo Street remained closed until November 16, 1967, when Taco Grande, a Mexican restaurant, opened there. It had 8 to 10 tables and a counter

where a table customer received his food. It was open for business from noon to 10 or 11 p.m., 7 days a week. It sold tacos, tostados, "tacoburgers," refried beans, "burritos," "sanchos," and chili. It went out of business July 7, 1969.

Although plaintiff's knowledge of his finances was slight, he estimated a daily loss of $50 to $75 in gross receipts from November 16, 1967, to July 20, 1969. The ratio of cost of ingredients to sale price varied considerably with the kind of food. He estimated that labor and overhead increased costs to 60 or 70 percent of sales. Excluded from labor costs were services rendered by plaintiff, his wife, and three daughters-in-law, who worked part time. He related the losses solely to competition with Taco Grande. His wife conceded some seasonal fluctuations in sales, otherwise corroborating him.

Plaintiff's wife and one of his daughters-in-law kept books of account from which certified public accountants prepared plaintiff's income tax returns. Jim Caltabiano, in addition to preparing the return for 1968, examined plaintiff's books from 1967 through October 1969, accepting them as correct. The principal records were a cash receipts journal, identified as exhibit 8, and an "expense ledger."

Exhibit 8 for April and May 1967, separately recorded receipts from each of plaintiff's stores, but it did not further break down receipts. In subsequent months two columns headed "Paid-Out" and "Salaries" were added for each store. Total deposits, payouts, and salaries represented gross sales. At Blondo Plaza they were:

|  | 1967 | 1968 | 1969 |
|---|---|---|---|
| January |  | $2,781 | $3,188 |
| February |  | 2,944 | 2,920 |
| March |  | 3,559 | 3,382 |
| April | $3,381 | 2,976 | 3,307 |
| May | 4,184 | 2,800 | 3,276 |
| June | 4,448 | 2,945 | 3,232 |

| | | | |
|---|---|---|---|
| July | 4,601 | 2,897 | **3,612 |
| August | 4,676 | 3,155 | 3,778 |
| September | 4,204 | 3,010 | 3,559 |
| October | 4,058 | 3,214 | 3,797 |
| November | *4,174 | 3,522 | 3,852 |
| December | 2,920 | 3,165 | 3,787 |

*Taco Grande opened.
**Taco Grande closed.

Caltabiano estimated plaintiff's net profits and losses before certain expenses at Blondo Plaza from this data: Merchandise inventory set out only as a lump sum for all stores in the 1967 and 1968 income tax returns; that part of exhibit 8 relating to the Blondo Plaza store; the ledger sheets; sales tax returns; traceable fixed expenses; allocated expenses; and a telephone conversation with the bookkeeper concerning number of employees, hours, and pay. He excluded depreciation, legal fees, interest, and several other items. He found the net profit or loss before the excluded expenses as follows:

| | 1967 | 1968 | 1969 |
|---|---|---|---|
| January | | $-368 | $-53 |
| February | | -275 | -65 |
| March | | 17 | 38 |
| April | | -277 | 17 |
| May | 795 | -231 | -7 |
| June | 832 | -201 | 38 |
| July | 861 | -313 | 477 |
| August | 835 | -108 | 588 |
| September | 654 | -272 | 414 |
| October | 470 | -86 | 618 |
| November | 615 | 66 | |
| December | -150 | -199 | |

Caltabiano estimated the ratio of net profits before the excluded expenses to gross sales at Blondo Plaza. Using a statistical "method of least squares," he plotted the future trend. It indicated a slight increase in profits, but a 1-month change in his base period would have turned the trend downward.

Caltabiano charged the Blondo Plaza store almost $17,000 for labor out of a total of $23,677.63 for the 3 stores in 1967. Yet the Blondo Plaza store contributed from 19 to 30 percent of gross receipts from the three stores. He knew that most of the employees worked at the Blondo Plaza store. For example, he testified, "Some . . . work at Blondo is baking bread that is delivered to the other stores, and they didn't charge the other stores with it." Defendant has not asserted a breach of the covenant against use of "non-selling space."

## INTERPRETATION OF THE LEASE

Omaha ordinances requiring permits to sell food defined restaurant as a "coffee shop, cafeteria, short order cafe, luncheonette, tavern, sandwich stand, soda fountain, ice cream stands, and all other public eating and/or drinking establishments, as well as kitchens in other places in which food or drink is prepared for sale elsewhere."

The state, for registration purposes, defined restaurant as a building used or held out to the public to be a place where meals and lunches were served. See § 41-104, R. R. S. 1943.

The phrase "snack bar" has been defined as follows: "A public eating place where snacks are served usually at a counter," Webster's Third New International Dictionary, p. 2154 (Unabr. Ed., 1961); "A lunch counter where light meals are served," The American Heritage Dictionary, p. 1222 (1969); "A lunchroom or restaurant where light meals are sold," The Random House Dictionary, p. 1346 (1966). Among the synonyms for "cafe" in the Original Roget's Thesaurus of English Words and Phrases, p. 114 (Dutch Am. Ed., 1962), are restaurant and snackbar.

Valid restraints of competition are not subject to strict construction by us. See Herpolsheimer v. Funke, 1 Neb. (Unof.) 304, 95 N. W. 687 (1901).

The trier of fact is to determine a question of interpretation of an integrated agreement if the question de-

pends on the credibility of extrinsic evidence or on a choice among reasonable inferences from extrinsic evidence. Restatement, Contracts 2d (Tent. Dr. No. 5, 1970), § 238(2), p. 142. See Ely Constr. Co. v. S & S Corp., 184 Neb. 59, 165 N. W. 2d 562 (1969).

Defendant argues that extrinsic evidence was limited to the circumstances at the time of the modification. The rule of "practical construction" by the parties during performance, we are told, was inapplicable. A jury might reasonably find that (1) defendant at the outset with knowledge of plaintiff's business made no protest and (2) the nature of the business did not significantly change while the term of the lease was running.

". . . The basis of inference in such cases is often an admission by one party, by his conduct, that the contract has a certain meaning . . .."

". . . However, the position taken by one party in the course of performance may signify to the other a representation or a promise on which he relies and acts to such an extent as to create an estoppel, and when this occurs the representation can not be corrected nor the promise revoked . . .."

". . . practical construction may entrap a party who is not alert to detect and repudiate practical interpretations with which he disagrees." Patterson, "The Interpretation and Construction of Contracts," 64 Colum. L. Rev. 833 at 844 and 845 (1964). See, also, Enterprise Co., Inc. v. Nettleton Business College, 186 Neb. 183 at 188, 181 N. W. 2d 846 (1970); cf. § 2-208 (1), U.C.C.

In the present case the lease was ambiguous and the extrinsic evidence for consideration as admissions embodied relevant conduct of the parties during performance. The evidence was sufficient to support a finding of breach of covenant by defendant.

### NOMINAL DAMAGES

Defendant contends that plaintiff at most could recover nominal damages; therefore, overruling the mo-

tion for judgment notwithstanding the verdict or for new trial, it adds, was error. The basis of the contention is not clear. It is enough that a jury on the evidence here might reasonably award plaintiff substantial damages. Overruling defendant's motion for judgment notwithstanding the verdict or for a new trial was not error. Such damage is rarely susceptible of accurate proof. Gallagher v. Vogel, 157 Neb. 670, 61 N. W. 2d 245 (1953).

## ADMISSIBILITY OF EVIDENCE

The rulings in question relate to exhibit 8 and re-cross-examination of Caltabiano. Only that part of the exhibit concerning the Blondo Plaza store was in evidence. Defendant offered the remainder of it and interrogated the witness concerning comparable estimates of net profits or losses and trend lines for the stores on Q and 30th Streets. The court sustained objections to the offer and the questions.

On the scope of cross-examination, loss of time and confusion of issues are sometimes important elements to be considered. Another is embodied in this rule: Where testimony is given by a witness on direct examination, from which an inference arises favorable to the party producing him, anything within the knowledge of the witness tending to rebut the inference is admissible on cross-examination. The opposing party is ordinarily entitled to pursue that line of cross-examination. See Clark v. Smith, 181 Neb. 461, 149 N. W. 2d 425 (1967).

Caltabiano tended to corroborate plaintiff's testimony that Taco Grande had caused substantial damage notwithstanding the concession by plaintiff's wife regarding seasonal fluctuations. Defendant might have elicited a positive correlation of sales, profits, and losses at the three stores. The rulings under the circumstances were too restrictive and prejudicially erroneous.

Defendant was entitled to a new trial but not to judgment notwithstanding the verdict. The judgment is

reversed and the cause remanded for a new trial.

REVERSED AND REMANDED FOR NEW TRIAL.